207 So.2d 61 (1968)
D.J. KING and Shirley G. King, Husband and Wife, Appellants,
v.
Donald V. ZAGORSKI, Appellee.
No. 67-50.
District Court of Appeal of Florida. Second District.
February 7, 1968.
*62 J.C. Adderly, of Sheppard & Adderly, Cape Coral, for appellants.
No appearance for appellee.
PIERCE, Judge.
This appeal by D.J. King and Shirley G. King, husband and wife, plaintiffs in the Court below, is from an adverse final judgment on the pleadings entered against them in a suit to quiet title.
On August 10, 1966, plaintiffs filed suit against Donald V. Zagorski to quiet title to certain described real property located in Lee County, Florida. The complaint alleged that the plaintiffs acquired title to said tract by virtue of a tax deed from the State pursuant to a tax certificate for unpaid taxes. The complaint otherwise contained the usual averments of a quiet title suit.
On September 20, 1966, Zagorski filed answer and counterclaim averring that he had enlisted in the U.S. Navy on March 14, 1946 and had served continuously with the Navy from that date until September 1, 1966, when he received an honorable discharge; and that he was therefore entitled, under the Soldiers' and Sailors' Civil Relief Act of 1940 (hereinafter referred to as the Civil Relief Act), to have the period for redemption of his real estate taxes extended past his discharge date. He averred he was "the owner in fee" of the lands in question by virtue of a warranty deed dated February 27, 1962, recorded on April 9, 1962. The counterclaim prayed that he be allowed to redeem, and that the tax deed of plaintiffs be adjudged void.
Thereafter, upon Zagorski's motion, the Court stayed the proceedings for six months from his discharge date of September 1. During that interval Zagorski made a "tender of redemption", and upon his further motion the Court entered final judgment on January 16, 1967, cancelling the tax deed of plaintiffs, adjudging and declaring Zagorski "to be the sole owner of the property described", and barring any further claim of plaintiffs.
The Civil Relief Act passed by the Congress on October 17, 1940, is contained in the compilations as U.S.C.A. Tit. 50, App. § 501 et seq., and has remained a part of the Federal law since passage, having spanned three wars in almost three decades. It is a comprehensive measure.
§ 510, abbreviated to its applicable parts here, states the underlying objective of the legislation:
"In order to provide for * * * the national defense under the emergent conditions which are threatening the peace and security of the United States and to enable the United States the more successfully to fulfill the requirements of the national defense, provision is hereby made to suspend enforcement of civil liabilities, in certain cases, of persons in the military service of the United States in order to enable such persons to devote their entire energy to the defense needs of the Nation, and to this end the following provisions *63 are made for the temporary suspension of legal proceedings and transactions which may prejudice the civil rights of persons in such service during the period herein specified * * *" (Emphasis supplied.)
§§ 525 and 590(1), principally relied upon by Zagorski, are inter alia as follows:
"§ 525 Statutes of limitations as affected by period of service.
The period of military service shall not be included in computing any period * * * limited by any law * * * for the bringing of any action or proceeding in any court * * * or other agency of government by or against any person in military service * * * nor shall any part of such period which occurs after * * * [Oct. 6, 1942] be included in computing any period * * * provided by any law for the redemption of real property sold * * * to enforce any * * * tax * * *."
"§ 590 Stay of enforcement of * * * taxes, etc.
(1) A person may, at any time during his period of military service or within six months thereafter, apply to a court for relief * * * in respect to any tax * * * whether falling due prior to or during his period of military service."
The U.S. Supreme Court in 1948 decided a case, Le Maistre v. Leffers, 333 U.S. 1, 68 S.Ct. 371, 92 L.Ed. 429, of far reaching importance involving this general question. The Le Maistre case originated in Florida and involved the construction of the Florida tax deed statutes in the light of the Civil Relief Act. Le Maistre owned land in Florida on which tax certificate was issued in 1940 for non-payment of 1939 taxes. He was on active duty in the Navy from August, 1942 to December, 1945. Application for tax deed was made in January, 1943, and was issued in March, 1943. In March, 1946, he filed suit in the local Court to set aside the tax deed. He was denied relief in the State Courts and took certiorari to the U.S. Supreme Court. The high Court granted the writ and held that since, under § 525, supra, he would have had from October 6, 1942 (when the Civil Relief Act became effective) to March 1, 1943 (the date tax deed was issued) within which to redeem the tax certificate, he was entitled to "the same length of time after his discharge" to redeem. Inasmuch as he was discharged on December 18, 1945, the high Court held that his action filed on March 25, 1946, was timely under § 525, being an interval less than the two years allowed for redemption, deducting the time tolled by military service.
Later, the Florida Supreme Court, in Burke v. O'Brien, Fla. 1950, 47 So.2d 777, applied the rationale of Le Maistre, holding that the tax deed was void when issued within two years from issuance of tax certificate, deducting the time of the owner's military service from the effective date of the Civil Relief Act [October 6, 1942] to his discharge date; and later applied it in Mirabella v. Kickliter, Fla.App. 1959, 113 So.2d 397, holding there that the tax deed under similar circumstances was invalid.
Recently the Florida Supreme Court, reversing the 1st District Court, Moorman v. Thomas, Fla.App. 1966, 192 So.2d 320, and overruling Burke expressly and Mirabella impliedly, held in Thomas v. Moorman, Fla. 1967, 199 So.2d 719, that a tax deed was voidable, not void, under comparable circumstances. But while the Florida cases have been running somewhat a treadmill, Le Maistre has remained the recognized overriding legal authority on the subject, at least within its factual orbit.
So, from a superficial consideration of all the foregoing, it would seem that Zagorski's contention was perhaps sound and the lower Court correct in decreeing for him. But upon more critical analysis, we are persuaded to a contrary conclusion, based upon vital factual differences between the previous *64 cases and the case sub judice. We think a chronological chart depicting the various events in the instant case might be helpful:

March 14, 1946 Zagorski enlisted in the U.S. Navy.
February 27, 1962 Zagorski acquired title by warranty deed to the property
 in question; documentary tax stamps indicated
 payment of approximately $2400 for the
 property.
June 3, 1963 Tax certificate No. 918 issued to plaintiffs herein.
June 6, 1966 Tax deed covering said property issued to plaintiffs.
August 10, 1966 Plaintiffs King filed suit against Zagorski to quiet
 title to said property, based upon said Tax Deed.
September 1, 1966 Zagorski was discharged from U.S. Navy.
September 20, 1966 Zagorski filed answer and counterclaim claiming
 benefit of the Civil Relief Act.
November 7, 1966 Order entered staying proceedings "for six months
 from September 1, 1966; and if the defendant
 redeems, this suit may be dismissed; otherwise,
 this suit is to proceed".
November 29, 1966 Zagorski makes tender of redemption.
January 16, 1967 Final Judgment entered for Zagorski, cancelling
 plaintiffs' tax deed and adjudging Zagorski to be
 sole owner of the property.

From the foregoing, it is obvious we have here a factually exceptional situation. Zagorski had been in the military service almost 16 years before he ever bought the property. He acquired it by a substantial payment of $2,400.00. The tax deed was not issued until three years after tax certificate was issued, and after he had owned the property for well over four years, during which time he had paid no taxes, even for the year he bought it. Three weeks after plaintiffs filed suit to quiet title Zagorski left the service, having served over 20 years. It was not until November 29, 1966, almost five years after he bought the property, that he offered to pay any taxes on the property.
We do not believe the Civil Relief Act was designed to cover such situation. It could hardly have been intended to completely exempt a career service man owning property, who is knowledgeable about his tax obligations and is in no way handicapped because of military status, from paying the usual taxes assessed on his property. This is exactly the preferred status claimed by Zagorski here, not only for his current taxes but also for future continuing taxes so long as he might elect to stay in the service, for five years or even for twenty or thirty years longer. He made no contention that he was under any economic stress or that he was physically handicapped or that he was personally removed from the area. He made no contention that he was in any manner whatsoever prejudiced in paying his taxes by being in the service.
Basically and in laymen's language, the Civil Relief Act was designed to protect, from harassment and injury in connection with their civil affairs, those who, usually in a state of current or impending military emergency, find themselves torn from their *65 normal business activities back home, and, in military raiment, en route to some far off place such as Bastogna or Dak To or plain Hill 618 to do battle for their country. It was not aimed primarily as protection for the career military man; certainly it was not reasonably intended to provide a cloak of immunity to a property owner who, even though in military service, was in no way disadvantaged from the ordinary civilian in payment of his normal ad valorem taxes for the upkeep of government. We find no reported case wherein the Civil Relief Act has been sought to be applied to a state of facts such as exists here.
The Act was passed by the Congress on October 17, 1940, and has remained a part of the Federal law since passage, having spanned three wars in almost three decades. Report No. 3001 of the House Committee on Military Affairs, accompanying the measure to Congress, is illuminating. Excerpts therefrom "explain the intent and scope of the legislation" as being to protect the service men "from harassment and injury in connection with their civil affairs during their terms of service * * *; in short, the method of the * * * Relief Act consists mainly in suspending proceedings and transactions during the soldier's or sailor's absence so that he might have an opportunity when he returns to be heard and to take measures to protect his interests".[1] (Emphasis supplied.) Significant is the fact that the present Civil Relief Act, to use the language of the Committee Report aforesaid, "is, in substance identical with the act of March 8, 1918" (U.S.C.A. Tit. 50, App. §§ 101, 165). Both the 1918 and 1940 Acts were enacted at times relatively contemporaneous with the inceptions of World Wars I and II.
Numerous provisions of the present Act indicate an intent to protect the new military man, rather than to provide a shield for the non-handicapped career man.
Thus in § 520 it is provided that the opening of any judgment rendered against a military man during his service is conditioned "that such person was prejudiced by reason of his military service in making his defense thereto".
And § 521 provides that any stay of Court proceedings is withheld if "the ability of plaintiff to prosecute the action or the defendant to conduct his defense is not materially affected by reason of his military service".
§ 523 provides that no Court judgment against a service man shall be stayed if "in the opinion of the court the ability of the defendant to comply with the judgment or order entered or sought is not materially affected by reason of his military service".
§ 522 provides that whenever any Court action against a service man for non-compliance with a contractual obligation is stayed, no penalty therefor shall accrue "if it shall appear * * * that by reason of such service the ability of such person to pay or perform was thereby materially impaired".
Lastly, § 590, supra, relied upon by Zagorski, provides for a stay of proceedings based upon a service man's tax liability "during his period of military service or within six months thereafter," but conditions such stay upon a showing that his "ability * * * to pay such tax * * * has * * * been materially affected by reason of his military service".
Two conclusions irresistibly arise from a consideration of these provisions: (1) that the Act was aimed mainly to protect the newcomer inducted into the military service, and (2) that the Act is bottomed upon the premise of "hardship".
The Court decisions construing the Act tend to bear this out. Boone v. Lightner, N.C. 1943, 319 U.S. 561, 63 S.Ct. 1223, 87 L.Ed. 1587, was a case wherein Boone refused to submit himself to the State Court for trial of civil issues because he was "in military service of the United States *66 as a Captain stationed in the office of the Under Secretary of War in Washington". The North Carolina Courts ruled that his refusal was not justified, and the U.S. Supreme Court, on writ of certiorari, affirmed. While that case dealt specifically with § 521 of the Civil Relief Act having to do with a stay of proceedings and containing the clause, hereinbefore quoted, giving the trial Courts discretion to determine whether his military service "materially affected" his ability to carry on the litigation, the language of the high Court was not restrictive to such Section but covered the broad import of the entire Act. It held that the overall purpose of the Act was "to protect those who have been obliged to drop their own affairs to take up the burdens of the nation".[2] (Emphasis supplied.)
The Court in Boone pointed out that the judicial discretion conferred in the Act was "deliberately chosen" to supplant the "rigid and undiscriminating suspension of civil proceedings" contained in the antecedent Act of 1918. And impliedly holding that the burden of proof as to "hardship" or prejudice" was upon Boone the opinion said 
"The Act makes no express provision as to who must carry the burden of showing that a party will or will not be prejudiced, in pursuance no doubt of its policy of making the law flexible to meet the great variety of situations no legislator and no court is wise enough to foresee. We, too, refrain from declaring any rigid doctrine of burden of proof in this matter, believing that courts called upon to use discretion will usually have enough sound sense to know from what direction their information should be expected to come. * * * We think the ultimate discretion includes a discretion as to whom the court may ask to come forward with the facts needful to a fair judgment". (Emphasis supplied.)
Boonc contains extensive footnotes from "Legislative Reports", "Notes as to the Provisions of the Bill", etc., which it stated influenced the flexible drafting of the Civil Relief Act on the question of "prejudice", described therein as "the very heart of the policy of the Act". Excerpts therefrom are set forth in the margin.[3]
*67 One thing further, it might be argued that, inasmuch as the trial Judge in this case held for Zagorski, it could be assumed the Court impliedly found the fact of prejudice on his part. But there was no allegation of prejudice. Zagorski made no attempt whatever to show hardship, prejudice, oppression, inconvenience, or any other disabling factor connected with his military service, which might warrant relief. His contention was squarely upon the statute itself in the abstract. Hence, if there was an area of factual discretion open to the Chancellor, there were no facts alleged or presented to show any hardship. And Zagorski was the logical party to show such "facts". See the opinion in Boone, supra.
Zagorski purchased the land some sixteen years after he entered military service. He made no claim to ignorance of the Florida laws as to payment of taxes or the consequences of nonpayment. He was under no handicap because of military service.
To permit a tax delinquent to finally redeem under such circumstances would be tantamount to giving a license to a career service man to acquire real property and then with impunity refuse to pay taxes thereon for so long as he should elect to remain in service, plus six months thereafter; while casually weighing whether his investment was worthwhile. At most, he would risk only a nominal per cent on the unpaid taxes if he finally chose to redeem after separating from the service. Such interpretation would give the career man an unwarranted weapon not intended by the Act. We are of the view that decree should have been for the plaintiffs.
The final judgment appealed from is thereupon 
Reversed.
ALLEN, Acting C.J., and HOBSON, J., concur.
NOTES
[1] See U.S.C.A. Tit. 50 App. p. 488 et seq.
[2] And even in Le Maistre, supra, the parting word is that "the Act must be read with an eye friendly to those who drop their affairs to answer their country's call." (Emphasis supplied.)
[3] "A universal stay against soldiers is wasteful, because hundreds of them are men of affairs and men of assets, and they have agents back here looking after their affairs. There is no earthly reason why the court proceedings should stay against them. It is the small man, or perhaps I should say the humble man, who has just himself and no agent and no outside assets, that we do not want to forget. He is the man we are thinking of. These other people can take care of themselves, and the court would say to them `No; your affair is a going concern; go ahead with the lawsuit, You have a lawyer, you have an agent, you have a corporation manager, and other things'".

(Major John H. Wigmore, one of the drafters of the Bill).
* * * * *
"Instead of a rigid suspension of all actions against a soldier, a restriction upon suits is placed only where a court is satisfied that the absence of the defendant in military service has materially impaired his ability to meet that particular obligation. Most of the actions sought to be brought against soldiers will be for small amounts and will thus be in a local court where the judge, if he does not already know, will be in a favorable position to learn whether or not the defendant who seeks the benefit of the statute has really been prejudiced by his military service. Though not in military service, he may have property from which the income continues to come in irrespective of his presence; perhaps he may be some ne're-do-well who only seeks to hide under the brown of his khaki;
* * * * *
"But in any case a rigid stay of all actions against the soldier is too broad. There are many men now in the Army who can and should pay their obligations in full. * * * This mere fact of being in military service is not enough; military service must be the reason for the defendant not meeting his obligations." (House Report on the Bill, No. 181, 65th Cong., 1st Sess.) (Emphasis supplied.)