488 P.2d 725

Master Sergeant John H. BAILEY and
Marie A. Bailey, his wife, Plain-
tiffs-Appellees,

v.

Leandro BARRANCA and Leanor B. Bar-
ranca, his wife et al., Defend-
ants-Appellants.

No. 9170.

Supreme Court of New Mexico.

June 30, 1971.

Rehearing Denied Aug. 2, 1971.

Roy F. Miller, Jr., Robert E. Melton, Albuquerque, for defendants-appellants.

William C. Bowers, Albuquerque, for plaintiffs-appellees.

OPINION

STEPHENSON, Justice.

Defendants-appellants Perea (Perea) appeal from an adverse judgment in an ejectment action brought by plaintiffs-appellees (Bailey).

This case has a rather complex and tangled factual, administrative and legal history which can best be stated in chronological order.

Mr. Bailey joined the army reserve in 1931 and in 1942 was called to active duty. He made the army his career, during the course of which he was for a time stationed in Albuquerque. He acquired a residence there in 1953 as to which there have been no problems in regard to taxes. He regularly claimed his veteran's exemption.

In December, 1955, twenty-four years after joining the reserve and thirteen years after going on active duty, he contracted to purchase the property involved in this action (the property) from Rollie L. Smith. The contract required monthly payments and provided in part:

"Purchaser agrees to assess said real estate, for taxation to himself for the year 1956 and thereafter; pay all taxes * * * that may hereafter be levied or ordered by lawful authority and which would in the event of failure so to do create a charge against the real estate."

Various other provisions relate to taxes and procedures and consequences in event of non-payment. So far as appears, the deed remains in escrow and Mr. Smith still holds legal title.

Bailey paid taxes for 1957 and 1959, the former as a result of a notice from the county treasurer received January 8, 1959 that the property was to be sold. No explanation appears as to the circumstances of the other payment. No other tax payments were made on the property until after a mandamus action we will mention presently.

In January, 1962 and January, 1966 the property was deeded to the state for non-payment of 1958 and 1962 property taxes respectively.

Mr. Bailey was discharged from the army on August 31, 1966 and remained in the state of Washington.

The tax commission, after dispatching to Bailey the notices required by § 72–8–30, N.M.S.A., 1953 (which were not received by the addressee) sold the property at public auction to Perea on May 26, 1967, and executed and delivered a deed to him dated June 14, 1967. Perea went into possession and on September 15, 1967, Mr. and Mrs. Perea contracted to sell the property to Mr. and Mrs. Barranca (Barranca), who immediately went into possession and who, incidentally, have not filed briefs in this appeal. The record indicates Barranca had no notice of Bailey's claim until later.

According to Bailey, various letters were written to the county treasurer inquiring about taxes on the property, all of which were unanswered and none of which were on file in the treasurer's office. Bailey knew the property was subject to tax and sale for non-payment thereof at least as early as January, 1959, when the 1957 taxes were paid. Notwithstanding the entirely unsatisfactory procedure of writing the county treasurer and Mr. and Mrs. Bailey's presence in Albuquerque for several days in 1962 or 1963, no effective action looking toward the payment of taxes such as rendering assessments, making telephone calls, utilizing friends, business or banking connections or consulting counsel was taken by Bailey until after he learned, in early June, 1967, of the sale of the property by the state to Perea.

Knowledge of the sale stimulated Bailey to vigorous activity. He employed counsel and went to Santa Fe "to try to redeem" the property. The nature of these efforts is not clear and it may be doubted that compliance with § 72–8–32, N.M.S.A., 1953 was had. Bailey thereafter successfully prosecuted a mandamus proceeding in Santa Fe County against the State Tax Commission. For some odd reason, neither Perea nor Barranca were made parties, from which it logically follows that their rights could not have been effected. In any case, as a result of the mandamus proceeding, which was not appealed, the tax commission issued a tax deed to Bailey on September 3, 1968, with the anomalous and unlikely result that as matters now stand, there are two tax deeds from the commission outstanding, one to Perea and one to Bailey. To add to the overall confusion, it is to be recalled that the deed from Mr. Smith to Bailey is undelivered.

■ Thereafter this action was filed. It is in ejectment, although it seeks other relief. No question was raised as to this however. Perea counterclaimed to quiet their title. Such a counterclaim is proper in an ejectment action. Martinez v. Mundy, 61 N.M. 87, 295 P.2d 209 (1956).

Mr. Smith, on Pereas' motion, was ordered made a party, obviously to defend against Pereas' counterclaim. He was served but defaulted. Perea asserts judgment should have been entered against him by default.

The trial court simply refused all of Pereas' requested findings (although to a considerable extent based upon undisputed evidence on Bailey's testimony), adopted all of Bailey's and entered judgment for Bailey, decreeing their ownership of the property and granting them possession. This appeal followed.

■ A review of New Mexico statutes pertaining to assessment and collection of taxes demonstrates that the ultimate responsibility for payment rests upon the property owner. The property owner is required to make a declaration of all prop-

erty subject to taxation annually. Section 72–2–3, N.M.S.A., 1953 (1969 Supp.). A delinquent taxpayer is bound to know that taxes on his land have not been paid. N. H. Ranch Co. v. Gann, 42 N.M. 530, 82 P.2d 632 (1938). Bailey did not receive the notices required by § 72–8–30, supra, to be mailed to him by the tax commission at least thirty days prior to the actual sale. However, such notice was mailed and it is specifically provided in the statute cited that the fact that the notice was not delivered to the addressee shall not affect the validity of any subsequent sale.

The New Mexico legislature, and the courts as well, have gone far towards attempting to clothe tax titles with a measure of certainty and security. It is held that a tax title is in the nature of a new and independent grant from the sovereign authority, and is a new and paramount title in fee simple absolute, striking down all previous titles and interests in the property. Alamogordo Improvement Co. v. Hennessee, 40 N.M. 162, 56 P.2d 1127 (1936). Section 72–8–20, N.M.S.A., 1953 has been referred to in our cases as being a "curative" statute that stringently limits the grounds upon which a successful attack upon a tax deed issued by the state may be made. Section 72–8–21, N.M.S.A., 1953 limits the time for bringing such action. The facts of this case do not fall within any of the statutory grounds. In his brief, Bailey speaks much of the failure to receive notices from the county treasurer, but under provisions of the curative statute, this court has held that failure of a county treasurer to send notice that property has been sold for taxes was a mere irregularity. Brown v. Gurley, 58 N.M. 153, 267 P.2d 134 (1954); Hood v. Bond, 42 N.M. 295, 77 P.2d 180 (1938). A tax sale will not be invalidated under the curative act for failure to give or of the taxpayer to receive notice of taxes due or that redemption time is about to expire. Lawson v. McKinney, 54 N.M. 179, 217 P.2d 258 (1950). The very purpose of the curative statute is to stabilize and render tax sales efficient, to collect delinquent taxes and confer on the purchasers something of substance. Taylor v. Shaw, 48 N.M. 395, 151 P.2d 743 (1944); Aragon v. Empire Gold Mining & Milling Co., 47 N.M. 299, 142 P.2d 539 (1943).

Similarly, § 72–8–28, N.M.S.A., 1953, giving the State Tax Commission power and authority to administer such property as we are concerned with and providing that conveyances of such property shall be valid for the purpose therein expressed, and § 72–8–43, N.M.S.A., 1953, clothing deeds executed by the State Tax Commission with prima facie evidence of validity, have caused this court to observe that "their obvious purpose is to give a measure of certainty and security to tax titles." First National Bank in Albuquerque v. State, 77 N.M. 695, 427 P.2d 225 (1967).

The efforts of the legislature and the courts to clothe tax titles with stature, security and validity have been for valid social and economic purposes. First, and most obviously, were such not the case, the state would be deprived of a significant source of revenue. Who would purchase such titles and how much would they pay were they not safe? Perhaps more important, owners of land purchased from the State Tax Commission by themselves or their predecessors in title would fear to develop or improve such property, or devote it to its highest and best economic use if such titles were not secure.

In the case at bar, Bailey could scarcely gain entree to the courthouse were it not for the provisions of § 525 of the Soldiers' and Sailors' Civil Relief Act, as amended on October 6, 1942 (50 U.S.C.A.App. § 525), upon which he must place his sole reliance. That statute provides:

"§ 525. Statutes of limitations as affected by period of service. The period of military service shall not be included in computing any period now or hereafter to be limited by any law * * * nor shall any part of such period which occurs after the date of enactment of the Soldiers' and Sailors' Civil Relief Act Amendments of 1942 [Oct. 6, 1942] be included in computing any period now or

hereafter provided by any law for the redemption of real property sold or forfeited to enforce any obligation, tax or assessment.

"Oct. 17, 1940, c. 888, § 205, 54 Stat. 1181; Oct. 6, 1942, c. 581, § 5, 56 Stat. 770."

Mr. Bailey's contention, distilled to its essence, is that regardless of all other factual and legal considerations, by virtue of the quoted statute, he must automatically prevail. If his position be meritorious, it would mean that a career service person could buy real estate, ignore and disregard his tax responsibilities for perhaps thirty years and then at his leisure during the redemption period following discharge, reclaim the property.

The effect of any such holding on tax titles is readily apparent. Nothing would normally appear in the county clerk's records indicating the military status of the person whose title was extinguished by the deed to the state. If a tax title were offered or appeared in the chain of title, a prospective purchaser or encumbrancer would be required at his peril to make inquiry from matters dehors the county records whether or not the person whose title was extinguished was then in service and, if so, whether he still was; if not, the date of his discharge, etc.

A grave situation would be thereby created. We need look no further than northern New Mexico for an example. The failure of the area to develop economically is doubtless due to various factors, but certainly one of the principal causes is the prevailing imperfection of land titles with the attending dampening effect on values, sales prices and the availability of credit where land is offered as security.

We cannot close our eyes to such matters and are unwilling to attribute to the Congress any intention that the Soldiers' and Sailors' Civil Relief Act should have any such strange, unsettling and deleterious effect, or to create a separate and favored class of career service people for no particular reason.

The act upon which Bailey relies was passed at a time of declared war when millions of young men had been required, or were about to be required, to drop their civilian affairs and enter service. The Congress had a natural and proper concern for the civil affairs of such persons. This is demonstrated by the legislative history of the act. Volume 88, Part 4, Congressional Record, 77th Congress, shows that substantial debate was had in both the House and Senate before the bill received final passage. At 5363, Representative John Sparkman stated:

"* * * That original act became law on October 17, 1940. Conditions have greatly changed since that original act was passed. At that time we were considering calling in an army of 900,000 men for the purpose of giving them 1 year's training. The maximum time that we thought they would be away from home at that time was 1 year. Today we are counting the Army in millions. We are at war. We are not calling these men simply for the purpose of training, but we are calling them for the duration of the emergency and no one knows how long that may be."

This statement indicates that Congress was cognizant of the distinction between newcomers and career men and was concerned with hardship.

At 5368–5369, Representative Overton Brooks reiterated the hardship requirement:

"The people back home feel, and this Congress feels, that the Nation's defenders should not be compelled to fight a battle on two fronts at once—one back home and the other on the firing line facing the enemies of democracy. We feel that the normal obligations of the man contracted prior to service induction should be suspended as far as practicable during this tour of duty, and that the soldier should be protected from default in his obligations due to his inability to pay caused by reduction in income due to service."

The House Report on the Bill, No. 181, states in part:

"But in any case a rigid stay of all actions against the soldier is too broad. There are many men now in the Army who can and should pay their obligations in full. * * * This mere fact of being in military service is not enough; military service must be the reason for the defendant not meeting his obligations."

Such hardship and prejudice is the very basis of judicial decisions upon which Bailey relies. For example, in Boone v. Lightner, 319 U.S. 561, 63 S.Ct. 1223, 87 L.Ed. 1587 (1943), the court construes the act in question and quotes from the House Judicial Committee Report as we have just done. In the body of the opinion, Mr. Justice Jackson states (at 319 U.S. 575, 63 S. Ct. 1231):

"The Soldiers' and Sailors' Civil Relief Act is always to be liberally construed to protect those who have been obliged to drop their own affairs to take up the burdens of the nation. * * *"

Bailey places principal reliance upon Le Maistre v. Leffers, 333 U.S. 1, 68 S.Ct. 371, 92 L.Ed. 429 (1947) and it is true that the case contains language favorable to him, although the facts differed considerably. But even there, the aspect of hardship and prejudice played its part. The court said:

"* * * the Act must be read with an eye friendly to those who dropped their affairs to answer their country's call."

This description does not fit Bailey, of whom it might be said that he dropped his affairs upon his retirement from the service.

A study of the act shows that the moving force in its enactment was a condition of national emergency and attendant concern for the civil hardship and prejudice which might result to those called upon to deal with it. It was enacted

"In order to provide for * * * the national defense under the *emergent* conditions which are threatening the peace and security of the United States. * * *" § 510. (Emphasis supplied.)

Prejudice by reason of military service must be shown to reopen a default judgment (§ 520(4)). A stay of proceedings may be granted in the discretion of the court if it has been convinced that the serviceman's ability to participate in a lawsuit is "materially affected by reason of his military service." (§ 521). Hardship is a factor in those sections dealing with fines and penalties on contracts (§ 522), stays of executions of judgments and attachments (§ 523), maximum rates of interest (§ 526) and installment contracts for the purchase of property (§ 531). The act is bottomed on a concern for prejudice and hardship.

Nearly three decades have passed since the amendment to the act and nearly twenty-five years since Le Maistre. What was a reasonable construction then is not necessarily reasonable now.

The reasoning in *King v. Zagorski*, 207 So.2d 61 (Fla.App.1968) seems to us most sound, particularly in light of present conditions, based on facts substantially identical to those which confront us, and construing the same section of the act upon which Bailey relies.

We deem the following quotations from King, relating as they do to an identical fact situation, as being particularly apt:

"We do not believe the Civil Relief Act was designed to cover such situation. It could hardly have been intended to completely exempt a career service man owning property, who is knowledgeable about his tax obligations and is in no way handicapped because of military status, from paying the usual taxes assessed on his property. * * * He made no contention that he was under any economic stress or that he was physically handicapped or that he was personally removed from the area. He made no contention that he was in any manner whatsoever prejudiced in paying his taxes by being in the service.

"Basically and in laymen's language, the Civil Relief Act was designed to protect, from harassment and injury in connec-

tion with their civil affairs, those who, usually in a state of current or impending military emergency, find themselves torn from their normal business activities back home, and, in military raiment, en route to some far off place such as Bastogna or Dak To or plain Hill 618 to do battle for their country. It was not aimed primarily as protection for the career military man; certainly it was not reasonably intended to provide a cloak of immunity to a property owner who, even though in military service, was in no way disadvantaged from the ordinary civilian in payment of his normal ad valorem taxes for the upkeep of government. We find no reported case wherein the Civil Relief Act has been sought to be applied to a state of facts such as exists here.

" * * *

"Two conclusions irresistibly arise from a consideration of these provisions [of the Act] : (1) that the Act was aimed mainly to protect the newcomer inducted into the military service, and (2) that the Act is bottomed upon the premise of 'hardship.'

" * * *

"Zagorski purchased the land some sixteen years after he entered military service. He made no claim to ignorance of the Florida laws as to payment of taxes or the consequences of nonpayment. He was under no handicap because of military service.

"To permit a tax delinquent to finally redeem under such circumstances would be tantamount to giving a license to a career service man to acquire real property and then with impunity refuse to pay taxes thereon for so long as he should elect to remain in service, plus six months thereafter; while casually weighing whether his investment was worthwhile. At most, he would risk only a nominal per cent on the unpaid taxes if he finally chose to redeem after separating from the service. Such interpretation would give the career man an unwarranted

weapon not intended by the Act. * * * "

It follows that the judgment must be reversed. The trial court is directed to set its judgment aside and enter judgment for Mr. and Mrs. Perea as prayed in their counterclaim quieting their title against Mr. and Mrs. Bailey and Mr. Smith.

It is so ordered.

COMPTON, C. J., and TACKETT, J., concur.