## CONROY *v.* ANISKOFF ET AL.

No. 91–1353.   Argued January 11, 1993—Decided March 31, 1993

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, BLACKMUN, O'CONNOR, KENNEDY, and SOUTER, JJ., joined, and in all but n. 12 of which THOMAS, J., joined. SCALIA, J., filed an opinion concurring in the judgment, *post*, p. 518.

*Robert H. Klonoff* argued the cause and filed briefs for petitioner.

*John F. Manning* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Starr, Acting Assistant Attorney General Bruton, Deputy Solicitor General Wallace, Richard Farber,* and *Bridget M. Rowan.*

*Kevin M. Cuddy* argued the cause and filed a brief for respondents.*

JUSTICE STEVENS delivered the opinion of the Court.†

The Soldiers' and Sailors' Civil Relief Act of 1940, 54 Stat. 1178, as amended, 50 U. S. C. App. § 501 *et seq.* (1988 ed. and Supp. III) (Act), suspends various civil liabilities of persons in military service. At issue in this case is the provision in § 525 that the "period of military service shall not be included in computing any period . . . provided by any law for the redemption of real property sold or forfeited to enforce any obligation, tax, or assessment."[1] The question presented is

---

*Lawrence M. Maher* filed a brief for Veterans of Foreign Wars of the United States as *amicus curiae.*

†JUSTICE THOMAS joins all but footnote 12 of the opinion.

[1] The full text of § 525 presently reads as follows:

"The period of military service shall not be included in computing any period now or hereafter to be limited by any law, regulation, or order for the bringing of any action or proceeding in any court, board, bureau, commission, department, or other agency of government by or against any person in military service or by or against his heirs, executors, administrators, or assigns, whether such cause of action or the right or privilege to institute such action or proceeding shall have accrued prior to or during the period of such service, nor shall any part of such period which occurs after October 6, 1942 be included in computing any period now or hereafter provided by any law for the redemption of real property sold or

whether a member of the Armed Services must show that his military service prejudiced his ability to redeem title to property before he can qualify for the statutory suspension of time.

I

Petitioner is an officer in the United States Army. He was on active duty continuously from 1966 until the time of trial. In 1973, he purchased a parcel of vacant land in the town of Danforth, Maine. He paid taxes on the property for 10 years, but failed to pay the 1984, 1985, and 1986 local real estate taxes.[2] In 1986, following the Maine statutory procedures that authorize it to acquire tax-delinquent real estate, the town sold the property.[3]

In 1987, petitioner brought suit in the Maine District Court against the town and the two purchasers. He claimed that §525 of the Act tolled the redemption period while he was in military service, and federal law therefore prevented the town from acquiring good title to the property even though the State's statutory procedures had been followed. The trial court rejected the claim. In an unreported opinion, it noted that some courts had construed §525 literally, but it elected to follow a line of decisions that refused to toll the redemption period unless the taxpayer could show that

forfeited to enforce any obligation, tax, or assessment." 50 U. S. C. App. §525 (1988 ed., Supp. III).

[2] He testified that he did not receive tax bills for those years and that his letters asking for tax bills were not answered by the town.

[3] Under Maine law a taxing authority has a lien against real estate until properly assessed taxes are paid. If taxes remain unpaid for 30 days after a notice of lien and demand for payment has been sent to the owner, the tax collector may record a tax lien certificate to create a tax lien mortgage. The taxpayer then has an 18-month period of redemption in which he may recover his property by paying the overdue taxes plus interest and costs. See Me. Rev. Stat. Ann., Tit. 36, §§552, 942, 943 (1990). It is stipulated that the required procedures were followed in this case and that the town's title was perfected, unless petitioner's objection based on §525 requires a different result.

"military service resulted in hardship excusing timely legal action."[4] It agreed with those courts that it would be "absurd and illogical" to toll limitations periods for career service personnel who had not been "handicapped by their military status."[5] The Supreme Judicial Court of Maine affirmed by an equally divided court.[6] We granted certiorari to resolve the conflict in the interpretation of § 525. 505 U. S. 1203 (1992).

II

The statutory command in § 525 is unambiguous, unequivocal, and unlimited. It states that the period of military service "shall not be included" in the computation of "any period now or hereafter provided by any law for the redemption of real property . . . ." Respondents do not dispute the plain meaning of this text. Rather, they argue that when § 525 is read in the context of the entire statute, it implicitly conditions its protection on a demonstration of hardship or prejudice resulting from military service. They make three points in support of this argument: that the history of the Act reveals an intent to provide protection only to those whose lives have been temporarily disrupted by military service; that other provisions of the Act are expressly conditioned on a showing of prejudice; and that a literal interpretation produces illogical and absurd results. Neither separately nor in combination do these points justify a departure from the unambiguous statutory text.

Respondents correctly describe the immediate cause for the statute's enactment in 1940, the year before our entry into World War II. Congress stated its purpose to "expedite the national defense under the emergent conditions which are threatening the peace and security of the United

---

[4] Pet. for Cert. 33. The court particularly relied on *Pannell* v. *Continental Can Co.*, 554 F. 2d 216 (CA5 1977); *Bailey* v. *Barranca*, 83 N. M. 90, 488 P. 2d 725 (1971); *King* v. *Zagorski*, 207 So. 2d 61 (Fla. App. 1968).

[5] Pet. for Cert. 34.

[6] *Conroy* v. *Danforth*, 599 A. 2d 426 (1991).

States . . . ." 50 U. S. C. App. § 510. That purpose undoubtedly contemplated the special hardship that military duty imposed on those suddenly drafted into service by the national emergency.[7] Neither that emergency, nor a particular legislative interest in easing sudden transfers from civilian to military status, however, justifies the conclusion that Congress did not intend all members of the Armed Forces, including career personnel, to receive the Act's protections. Indeed, because Congress extended the life of the Act indefinitely in 1948,[8] well after the end of World War II, the complete legislative history confirms a congressional intent to protect all military personnel on active duty, just as the statutory language provides.

Respondents also correctly remind us to "follow the cardinal rule that a statute is to be read as a whole, see *Massachusetts* v. *Morash*, 490 U. S. 107, 115 (1989), since the meaning of statutory language, plain or not, depends on context." *King* v. *St. Vincent's Hospital*, 502 U. S. 215, 221 (1991). But as in *King*, the context of this statute actually supports the conclusion that Congress meant what § 525 says. Several provisions of the statute condition the protection they offer on a showing that military service adversely affected the ability to assert or protect a legal right. To choose one of many examples, § 532(2) authorizes a stay of enforcement of secured obligations unless "the ability of the defendant to comply with the terms of the obligation is not materially

---

[7] Respondents emphasize that the statement of purposes refers to the "'temporary suspension of legal proceedings and transactions.'" Brief for Respondents 8, quoting 50 U. S. C. App. § 510. The length of a suspension that lasts as long as the period of active service is "temporary," however, whether it applies to a short enlistment or a long career.

[8] Section 14 of the Selective Service Act of 1948, 62 Stat. 623, provided that the 1940 Act "shall be applicable to all persons in the armed forces of the United States" until the 1940 Act "is repealed or otherwise terminated by subsequent Act of the Congress."

affected by reason of his military service."[9]  The comprehensive character of the entire statute indicates that Congress included a prejudice requirement whenever it considered it appropriate to do so, and that its omission of any such requirement in § 525 was deliberate.

Finally, both the history of this carefully reticulated statute, and our history of interpreting it, refute any argument that a literal construction of § 525 is so absurd or illogical that Congress could not have intended it.  In many respects the 1940 Act was a reenactment of World War I legislation that had, in turn, been modeled after legislation that several States adopted during the Civil War.  See *Boone* v. *Lightner*, 319 U. S. 561, 565–569 (1943).  The Court had emphasized the comprehensive character and carefully segregated arrangement of the various provisions of the World War I statute in *Ebert* v. *Poston*, 266 U. S. 548, 554 (1925), and it had considered the consequences of requiring a showing of prejudice when it construed the World War II statute in *Boone, supra*.  Since we presume that Congress was familiar with those cases,[10] we also assume that Congress considered the decision in *Ebert* to interpret and apply each provision of the Act separately when it temporarily reestablished the law as a whole in 1940, and then considered *Boone*'s analysis of a prejudice requirement when it permanently extended the Act in 1948.

Legislative history confirms that assumption.  Since the enactment of the 1918 Act, Congress has expressed its understanding that absolute exemptions might save time or

---

[9] Similar qualifications appear in § 520(4) (applying to the reopening of judgments against an absent service member); §§ 521 and 523 (providing for stays of legal proceedings, attachments, and garnishments); § 526 (regulating interest rates on obligations incurred prior to military service); § 530(3) (covering eviction and distress proceedings); § 531(3) (involving the termination of installment contracts); § 535(1) (involving the assignment of insurance coverage); and § 535(2) (limiting the right to enforce liens for the storage of personal property).

[10] See *Cannon* v. *University of Chicago*, 441 U. S. 677, 696–697 (1979).

money for service members only at the cost of injuring their own credit, their family's credit, and the domestic economy;[11] it presumably required a showing of prejudice only when it seemed necessary to confer on the service member a genuine benefit. By distinguishing sharply between the two types of protections, Congress unquestionably contemplated the ways that either type of protection would affect both military debtors and their civilian creditors.

The long and consistent history and the structure of this legislation therefore lead us to conclude that—just as the language of § 525 suggests—Congress made a deliberate policy judgment placing a higher value on firmly protecting the service member's redemption rights than on occasionally burdening the tax collection process. Given the limited number of situations in which this precisely structured statute offers such absolute protection, we cannot say that Con-

---

[11] The House Report on the suspension of suits in the 1918 Act, for example, provided in part:

"The lesson of the stay laws of the Civil War teaches that an arbitrary and rigid protection against suits is as much a mistaken kindness to the soldier as it is unnecessary. A total suspension for the period of the war of all rights against a soldier defeats its own purpose. In time of war credit is of even more importance than in time of peace, and if there were a total prohibition upon enforcing obligations against one in military service, the credit of a soldier and his family would be utterly cut off. No one could be found who would extend them credit." H. R. Rep. No. 181, 65th Cong., 1st Sess., 2–3 (1917).

And Congressman Webb, Chairman of the House Judiciary Committee, stated:

"Manifestly, if this Congress should undertake to pass an arbitrary stay law providing that no creditor should ever sue or bring proceedings against any soldier while in the military service of his country, that would upset business very largely in many parts of the country. In the next place, it would be unfair to the creditor as well as to the soldier. It would disturb the soldier's credit probably in many cases and would deny the right of the creditor to his just debts from a person who was amply able to pay and whose military service did not in the least impair his ability to meet the obligation." 55 Cong. Rec. 7787 (1917). See Boone v. Lightner, 319 U. S. 561, 566, 567, 568 (1943).

gress would have found our straightforward interpretation and application of its words either absurd or illogical.[12] If the consequences of that interpretation had been—or prove to be—as unjust as respondents contend, we are confident that Congress would have corrected the injustice—or will do so in the future.

The judgment of the Supreme Judicial Court of Maine is reversed.

*It is so ordered.*

JUSTICE SCALIA, concurring in the judgment.

The Court begins its analysis with the observation: "The statutory command in § 525 is unambiguous, unequivocal, and unlimited." *Ante,* at 514. In my view, discussion of that point is where the remainder of the analysis should have ended. Instead, however, the Court feels compelled to demonstrate that its holding is consonant with legislative history, including some dating back to 1917—*a full quarter century*

---

[12] In his 11-page opinion concurring in the judgment, JUSTICE SCALIA suggests that our response to respondents' reliance on legislative history "is not merely a waste of research time and ink," but also "a false and disruptive lesson in the law." *Post,* at 519. His "hapless law clerk," *post,* at 527, has found a good deal of evidence in the legislative history that many provisions of this statute were intended to confer discretion on trial judges. That, of course, is precisely our point: It is reasonable to conclude that Congress intended to authorize such discretion when it expressly provided for it and to deny such discretion when it did not. A jurisprudence that confines a court's inquiry to the "law as it is passed," and is wholly unconcerned about "the intentions of legislators," *post,* at 519, would enforce an unambiguous statutory text even when it produces manifestly unintended and profoundly unwise consequences. Respondents have argued that this is such a case. We disagree. JUSTICE SCALIA, however, is apparently willing to assume that this is such a case, but would nevertheless conclude that we have a duty to enforce the statute as written even if fully convinced that every Member of the enacting Congress, as well as the President who signed the Act, intended a different result. Again, we disagree. See *Wisconsin Public Intervenor* v. *Mortier,* 501 U. S. 597, 610, n. 4 (1991).

before the provision at issue was enacted. That is not merely a waste of research time and ink; it is a false and disruptive lesson in the law. It says to the bar that even an "unambiguous [and] unequivocal" statute can never be dispositive; that, presumably under penalty of malpractice liability, the oracles of legislative history, far into the dimmy past, must always be consulted. This undermines the clarity of law, and condemns litigants (who, unlike us, must pay for it out of their own pockets) to subsidizing historical research by lawyers.

The greatest defect of legislative history is its illegitimacy. We are governed by laws, not by the intentions of legislators. As the Court said in 1844: "The law as it passed is the will of the majority of both houses, *and the only mode in which that will is spoken is in the act itself . . . .*" *Aldridge* v. *Williams,* 3 How. 9, 24 (emphasis added). But not the least of the defects of legislative history is its indeterminacy. If one were to search for an interpretive technique that, *on the whole,* was more likely to confuse than to clarify, one could hardly find a more promising candidate than legislative history. And the present case nicely proves that point.

Judge Harold Leventhal used to describe the use of legislative history as the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends. If I may pursue that metaphor: The legislative history of § 205 of the Soldiers' and Sailors' Civil Relief Act[1] contains a variety of diverse personages, a selected few of whom—its "friends"—the Court has introduced to us in support of its result. But there are many other faces in the crowd, most of which, I think, are set against today's result.

I will limit my exposition of the legislative history to the enactment of four statutes:

---

[1] The Court refers to this section as "§ 525," which corresponds to the unofficial codification of the section in the United States Code, 50 U. S. C. App. § 525. I find it more convenient to use the actual statutory section number—"§ 205"—in discussing the history of the provision.

1. The Soldiers' and Sailors' Civil Relief Act of 1918 (1918 Act), 40 Stat. 440;

2. The Soldiers' and Sailors' Civil Relief Act of 1940 (1940 Act or Act), 54 Stat. 1178;

3. The Soldiers' and Sailors' Civil Relief Act Amendments of 1942 (1942 Amendments), 56 Stat. 769;

4. The Selective Service Act of 1948, 62 Stat. 604.

That, of course, cannot be said to be the "*complete* legislative history" relevant to this provision. Cf. *ante*, at 515. One of the problems with legislative history is that it is inherently open ended. In this case, for example, one could go back further in time to examine the Civil War-era relief Acts, many of which are in fact set forth in an appendix to the House Report on the 1918 Act, see App. A, H. R. Rep. No. 181, 65th Cong., 1st Sess., 18–32 (1917) (hereinafter 1917 House Report). Or one could extend the search abroad and consider the various foreign statutes that were mentioned in that same House Report. See *id.*, at 4, 13–14 (discussing English and French enactments). Those additional statutes might be of questionable relevance, but then so too are the 1918 Act and the 1940 Act, neither of which contained a provision governing redemption periods. Nevertheless, I will limit my legislative history inquiry to those four statutes for the simple reason that that is the scope chosen by the Court.

The 1918 Act appears to have been the first comprehensive national soldiers' relief Act. See 55 Cong. Rec. 7787 (1917). The legislative history reveals that Congress intended[2] that

---

[2] When I say "Congress intended," here and hereafter in this excursus into legislative history, I am speaking as legislative historians speak, attributing to all Members of both Houses of Congress (or at least to a majority of the Members of each House), and to the President (or, if the President did not sign the bill in question, then to at least two-thirds of the Members of both Houses of Congress) views expressed by the particular personage, or committee of personages, whose statements are being described—in the case of the citation at issue in this sentence, a committee of the House of Representatives. It is to be assumed—by a sort of sus-

it serve the same vital purpose—providing "protection against suit to men in military service"—as various state statutes had served during the Civil War. 1917 House Report 3; see also *id.*, at 18–32 (App. A) (setting forth text of numerous state soldiers' relief Acts from the Civil War era). Congress intended, however, that the 1918 Act should differ from the Civil War statutes "in two material respects." 55 Cong. Rec. 7787 (1917) (statement of Rep. Webb). The first was that, being a national statute, it would produce a disposition "uniform throughout the Nation." 1917 House Report 3; see also 55 Cong. Rec. 7787 (1917) (statement of Rep. Webb). But it is the second difference which has particular relevance to the Court's ruling today:

> "The next material difference between this law and the various State laws is this, and in this I think you will find the chief excellence of the bill which we propose: Instead of the bill we are now considering being arbitrary, inelastic, inflexible, the discretion as to dealing out even-handed justice between the creditor and the soldier, taking into consideration the fact that the soldier has been called to his country's cause, rests largely, and in some cases entirely, in the breast of the judge who tries the case." *Id.*, at 7787 (statement of Rep. Webb).[3]

This comment cannot be dismissed as the passing remark of an insignificant Member, since the speaker was the Chairman of the House Judiciary Committee, the committee that re-

---

pension of disbelief—that two-thirds of the Members of both Houses of Congress (or a majority plus the President) were aware of those statements and must have agreed with them; or perhaps it is to be assumed—by a sort of suspension of the Constitution—that Congress delegated to that personage or personages the authority to say what its laws mean.

[3] In quoting this floor statement, I follow the convention of legislative history, which is to assume conclusively that statements recorded in the Congressional Record were in fact made. That assumption of course does not accord with reality. See 117 Cong. Rec. 36506–36507 (1971) (supposed floor statement shown by internal evidence never to have been delivered).

ported the bill to the House floor. Moreover, his remarks merely echoed the House Report, which barely a page into its text stated: "We cannot point out too soon, or too emphatically, that the bill is not an inflexible stay of all claims against persons in military service." 1917 House Report 2. Congress intended to depart from the "arbitrary and rigid protection" that had been provided under the Civil War-era stay laws, *ibid.*, which could give protection to men "who can and should pay their obligations in full," *id.*, at 3. It is clear, therefore, that in the 1918 Act Congress intended to create flexible rules that would permit denial of protection to members of the military who could show no hardship.

The 1918 Act expired by its own terms six months after the end of the First World War. See 1918 Act, § 603, 40 Stat. 449. The 1940 Act was adopted as the Nation prepared for its coming participation in the Second World War. Both the House and Senate Reports described it as being, "in substance, identical with the [1918 Act]." H. R. Rep. No. 3001, 76th Cong., 3d Sess., 3 (1940); S. Rep. No. 2109, 76 Cong., 3d Sess., 4 (1940). Moreover, in *Boone* v. *Lightner*, 319 U. S. 561, 565 (1943), we acknowledged that the 1940 Act was "a substantial reenactment" of the 1918 Act, and looked to the legislative history of the 1918 Act for indications of congressional intent with respect to the 1940 Act. Relying on that legislative history, we found that "the very heart of the policy of the Act" was to provide "judicial discretion . . . instead of rigid and undiscriminating suspension of civil proceedings." *Ibid.*

Although the Court never mentions this fact, it is clear that under the 1918 and 1940 Acts a redemption period would not be tolled during the period of military service. In both enactments, § 205 governed only statutes of limitations and did not mention redemption periods.[4] Moreover, in

---

[4] Section 205 of the 1918 Act provided:

"That the period of military service shall not be included in computing any period now or hereafter to be limited by any law for the bringing of

*Ebert* v. *Poston*, 266 U. S. 548 (1925), this Court held that neither § 205 nor § 302, which provides protection from foreclosures, conferred on a court any power to extend a statutory redemption period. Congress overturned the rule of *Ebert* in the 1942 Amendments, a central part of the legislative history that the Court curiously fails to discuss. Section 5 of those amendments rewrote § 205 of the Act to place it in its current form, which directly addresses the redemption periods. See 56 Stat. 770–771; *ante,* at 512–513, n. 1 (setting forth current version of § 205). The crucial question in the present case (if one believes in legislative history) is whether Congress intended this amendment to be consistent with the "heart of the policy of the Act"—conferring judicial discretion—or rather intended it to confer an unqualified right to extend the period of redemption. Both the House and Senate Reports state that, under the amended § 205, "[t]he running of the statutory period during which real property may be redeemed after sale to enforce any obligation, tax, or assessment is *likewise* tolled during the part of such period which occurs after the enactment of the [1942 Amendments]." H. R. Rep. No. 2198, 77th Cong., 2d Sess., 3–4 (1942) (emphasis added); S. Rep. No. 1558, 77th Cong., 2d Sess., 4 (1942) (emphasis added). The Reports also state that "[a]lthough the tolling of such periods is now within the spirit of the law, it has not been held to be within the letter thereof" (citing *Ebert*). H. R. Rep. No. 2198, *supra,* at 4; S. Rep. No. 1558, *supra,* at 4. These statements surely indicate an intention to provide a tolling period for redemptions similar to that already provided for statutes of limitations—which, on the basis of the legislative history I have de-

---

any action by or against any person in military service or by or against his heirs, executors, administrators, or assigns, whether such cause of action shall have accrued prior to or during the period of such service." 40 Stat. 443.

Section 205 of the 1940 Act was identical, except that the word "That" at the beginning of the section was omitted.

scribed, can be considered discretionary rather than rigid. The existence of discretionary authority to suspend the tolling is also suggested by the House floor debates. Responding to questions, Representative Sparkman (who submitted the Report on behalf of the House Committee on Military Affairs) agreed that, while the bill "pertains to all persons in the armed forces," a man "serving in the armed forces for more money than he got in civil life . . . is not entitled to any of the benefits of the provisions of this bill." 88 Cong. Rec. 5364, 5365 (1942). In response to that last comment, another Representative inquired further whether "[t]his is to take care of the men who are handicapped because of their military service." *Id.*, at 5365. Representative Sparkman answered affirmatively. *Ibid.* He confirmed that Congress did not intend to abandon the discretionary nature of the scheme: "With reference to all these matters we have tried to make the law flexible by lodging discretion within the courts to do or not to do as justice and equity may require." *Ibid.* And finally, at a later point in the debates, Representative Brooks made clear that the Act was intended to remedy the prejudice resulting from compelled military service: "We feel that the normal obligations of the man contracted prior to service induction should be suspended as far as practicable during this tour of duty, and that the soldier should be protected from default in his obligations due to his inability to pay caused by reduction in income due to service." *Id.*, at 5369.

The final component of the legislative history that I shall treat is the extension of the 1940 Act in the Selective Service Act of 1948, 62 Stat. 604. The Court misconstrues Congress's intent in this enactment in two respects. First, it asserts that "because Congress extended the life of the Act indefinitely in 1948, well after the end of World War II, the complete legislative history confirms a congressional intent to protect all military personnel on active duty, just as the statutory language provides." *Ante*, at 515 (footnote omit-

ted). It is true enough that the War was over; but the draft was not. The extension of the 1940 Act was contained in the *Selective Service Act of 1948*, which *required* military service from citizens. And it would appear to have been contemplated that the "life of the Act" would be extended not "indefinitely," as the Court says, *ibid.*, but for the duration of the draft. See H. R. Rep. No. 1881, 80th Cong., 2d Sess., 12 (1948) (extension was intended to "continu[e] the Soldiers' and Sailors' Civil Relief Act of 1940 in its application to the personnel inducted or entering the armed forces during the life of this act"). The legislative history states that Congress intended to extend the provisions of the 1940 Act "to persons serving in the armed forces *pursuant to this act.*" S. Rep. No. 1268, 80th Cong., 2d Sess., 21 (1948) (emphasis added). Career members of the military such as petitioner would not have been serving "pursuant to" the Selective Service Act, since they were expressly excepted from its service requirement. See Selective Service Act of 1948 § 6(a), 62 Stat. 609. In this focus upon draftees, the legislative history of the 1948 extension merely replicates that of the 1940 Act and the 1942 Amendments. The former was enacted on the heels of the Selective Training and Service Act of 1940, 54 Stat. 885, and was introduced on the Senate floor with the explanation that it would provide "relief . . . to those who are to be *inducted* into the military service for training under [the Selective Training and Service Act of 1940]." 86 Cong. Rec. 10292 (1940) (statement of Rep. Overton) (emphasis added). In the debate on the 1942 Amendments, Representative Sparkman noted that "hundreds of thousands, and even millions, have been called" into military service since the enactment of the 1940 Act, and admonished his colleagues to "keep uppermost in your mind at all times the fact that the primary purpose of this legislation is to give relief to the boy that is called into service." 88 Cong. Rec. 5364 (1942). In other words, the legislative history of the 1948 extension, like that of the Act itself and

of the 1942 Amendments, suggests an intent to protect those who were *prejudiced* by military service, as many who were drafted would be.

The Court also errs in mistaking the probable effect of Congress's presumed awareness of our earlier opinions in *Ebert* and *Boone*. See *ante*, at 516. In *Boone*, we stated that the Act "is always to be liberally construed to protect those who have been *obliged* to drop their own affairs to take up the burdens of the nation," 319 U. S., at 575 (emphasis added), but that discretion was vested in the courts to ensure that the immunities of the Act are not put to "unworthy use," *ibid.*, since "the very heart of the policy of the Act" was to provide "judicial discretion . . . instead of rigid and undiscriminating suspension of civil proceedings," *id.*, at 565. Awareness of *Boone* would likely have caused Congress to assume that the courts would *vindicate* "the very heart of the policy of the Act" by requiring a showing of prejudice. The Court argues, however, that Congress would *also* have been aware that *Ebert* recognized the "carefully segregated arrangement of the various provisions" of the Act, *ante*, at 516. It is already an extension of the normal convention to assume that Congress was aware of the precise reasoning (as opposed to the holding) of earlier judicial opinions; but it goes much further to assume that Congress not only knew, but expected the courts would continue to follow, the reasoning of a case *(Ebert)* whose holding Congress had repudiated six years earlier. See *supra*, at 523. In any event, the Court seeks to use *Ebert* only to establish that Congress was aware that this Court was aware of the "carefully segregated arrangement" of the Act. That adds little, if anything, to direct reliance upon the plain language of the statute.

After reading the above described legislative history, one might well conclude that the result reached by the Court today, though faithful to law, betrays the congressional intent. Many have done so. Indeed, as far as I am aware, *every court* that has chosen to interpret § 205 in light of its

legislative history rather than on the basis of its plain text has found that Congress did not intend § 205 to apply to career members of the military who cannot show prejudice or hardship. See, in addition to the court below, *Pannell* v. *Continental Can Co.*, 554 F. 2d 216, 224–225 (CA5 1977); *Bailey* v. *Barranca*, 83 N. M. 90, 94–95, 488 P. 2d 725, 729–730 (1971); *King* v. *Zagorski*, 207 So. 2d 61, 66–67 (Fla. App. 1968). The only scholarly commentary I am aware of addressing this issue concludes: "An examination of the legislative history of the Act shows that the prevailing interpretation of section 205 [*i. e.*, the Court's interpretation] is not consistent with congressional intent." Folk, Tolling of Statutes of Limitations under Section 205 of the Soldiers' and Sailors' Civil Relief Act, 102 Mil. L. Rev. 157, 168 (1983). Finally, even the Government itself, which successfully urged in this case the position we have adopted, until recently believed, on the basis of legislative history, the contrary. See *Townsend* v. *Secretary of Air Force*, No. 90–1168, 1991 U. S. App. LEXIS 26578, *5–*7 (CA4, Nov. 12, 1991); Brief for United States as *Amicus Curiae* 17, n. 19 (filed June 2, 1992) (noting Government's position in *Townsend* that § 205 requires a showing of prejudice); see also *Bickford* v. *United States*, 656 F. 2d 636, 640 (Ct. Cl. 1981) ("The Government argues that the statute does not mean what it says because the legislative history evinces Congress' intent to limit the applicability of [§ 205] to those servicemen engaged in battle or who are otherwise handicapped from asserting their legal claims").

I confess that I have not personally investigated the entire legislative history—or even that portion of it which relates to the four statutes listed above. The excerpts I have examined and quoted were unearthed by a hapless law clerk to whom I assigned the task. The other Justices have, in the aggregate, many more law clerks than I, and it is quite possible that if they all were unleashed upon this enterprise they would discover, in the legislative materials dating back to

1917 *or earlier*, many faces friendly to the Court's holding. Whether they would or not makes no difference to me—and evidently makes no difference to the Court, which gives lipservice to legislative history but does not trouble to set forth and discuss the foregoing material that others found so persuasive. In my view, that is as it should be, except for the lipservice. The language of the statute is entirely clear, and if that is not what Congress meant then Congress has made a mistake and Congress will have to correct it. We should not pretend to care about legislative intent (as opposed to the meaning of the law), lest we impose upon the practicing bar and their clients obligations that we do not ourselves take seriously.