**THIRD DIVISION**
**DILLARD, C. J.,**
**GOBEIL and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 25, 2019**

# In the Court of Appeals of Georgia

A19A0425. UHS OF ANCHOR, L.P. d/b/a SOUTHERN CRESCENT BEHAVIORAL HEALTH SYSTEM v. GEORGIA DEPARTMENT OF COMMUNITY HEALTH et al.

DILLARD, Chief Judge.

In this discretionary appeal, UHS of Anchor, L.P. d/b/a Southern Crescent Behavioral Health System ("Southern Crescent") appeals from the trial court's order denying a petition for judicial review. In doing so, the trial court affirmed a final agency decision of the Georgia Department of Community Health in favor of Premier Health Care Investments, LLC d/b/a Flint River Hospital ("Flint River"). Southern Crescent argues that the trial court erred in denying the petition for review when the Department's decision (1) does not follow its rules and is inconsistent with the plain language of various Georgia statutes; and (2) departs from longstanding departmental

precedent and practice, making the decision arbitrary and capricious, and violating Southern Crescent's constitutional rights. For the reasons set forth *infra*, we reverse.

On April 21, 2016, Lake Bridge Behavior Health System ("Lake Bridge"), a sister facility to Southern Crescent, sent the Department correspondence expressing concern that Flint River in Montezuma, Georgia, was providing "potentially unauthorized psychiatric and/or substance abuse inpatient care" by "operating beyond its Certificate of Need . . . authorization" limit as to the number of beds available for providing such care. According to the letter and its attached exhibits, Flint River was only authorized to operate 12 psychiatric/substance-abuse beds but was instead operating 30 psychiatric beds and nine substance-abuse beds. As a result, Lake Bridge requested that the Department investigate and issue a cease-and-desist letter to prevent Flint River from operating beyond the authorization within its Certificate of Need ("CON").

The Department subsequently launched an investigation and, on July 27, 2016, issued a cease-and-desist letter, detailing its conclusion that Flint River was "operating its adult psychiatric and/or substance abuse inpatient program beyond the scope of its CON authorization by operating more than twelve (12) adult acute care psychiatric/substance abuse inpatient beds." Specifically, the Department concluded

that Flint River expanded its psychiatric/substance-abuse services without first obtaining the necessary authorization to do so. Thus, the Department ordered Flint River to cease and desist from offering services beyond the 12 CON-authorized beds.

Flint River appealed from the Department's issuance of the cease-and-desist letter, which was then reviewed by a hearing officer at a proceeding on June 13, 2017.[1] And during that hearing, Flint River *admitted* that despite receiving CON approval in 2010 to operate 12 psychiatric inpatient beds, it had—since 2014—used more than 12 beds for the treatment of psychiatric/substance-abuse patients. Nevertheless, Flint River argued that the CON law allowed it to "flex" its short-stay hospital beds for use with its psychiatric-inpatient program and "shift beds between approved categories, so long as it does not exceed its total CON-approved bed capacity."

The hearing officer considered the parties' arguments and the relevant rules and laws, and then concluded that "a provider may not shift or 'flex' beds." The officer also determined that Flint River (1) never gave the appropriate Department division notice that it was operating beyond its 12-bed CON authorization for

---

[1] Southern Crescent was granted status as a party intervenor to Flint River's appeal.

psychiatric/substance-abuse treatment, and (2) failed to comply with a Department rule allowing it to obtain a determination as to whether a proposed action required CON approval. The officer also contrasted Flint River's operations from those of other hospitals it claimed had been permitted to "flex" their approved beds. Thus, the hearing officer affirmed the Department's issuance of the cease-and-desist letter.

Thereafter, the Office of the Commissioner for the Department conducted a review of the hearing officer's decision at Flint River's request. The Department found that because Flint River had (1) prior CON approval to offer beds for adult psychiatric/substance-abuse treatment, (2) "reconfigured" the use of other existing beds for such treatment but did "not exceed its licensed evaluated bed capacity," and (3) costs associated with the reconfiguration that "were under the capital expenditure threshold," its actions "did not trigger prior CON review and approval."[2]

---

[2] In reaching this conclusion, the Department cited to its "review of past determinations in which bed reconfigurations were requested" and determined that Flint River's "circumstance fits within this framework"; but the Department did not provide any details of these "past determinations."

4

In doing so, the Department reasoned as follows:

Since the Department determined that [Flint River's] bed reconfiguration was accomplished within the meaning of [OCGA] § 31-6-2 (14) and [OCGA] § 31-6-40[,] the Department disagrees with the [h]earing [o]fficer's . . . [c]onclusion . . . [which] mischaracterizes "expansion" to simply mean the addition of beds. The analysis requires a more detailed examination of the subsections addressing "Applicability" and "Definitions" contained in both Ga. Comp. R. & Regs. r. 111-2-2-.20 and 111-2-2-.26, respectively, which are not addressed in the [hearing officer's] [f]inal [o]rder. Such a mischaracterization is misleading and limiting in view of the Department's treatment of reconfigurations[.] Therefore, the Department's analysis is more reasonable than that of the [h]earing [o]fficer. . . . Proposed bed reconfigurations that satisfy the conditions set forth above may not always require prior CON review and approval.

It is from this final decision by the Department's Office of the Commissioner that Southern Crescent filed its petition for judicial review, under OCGA § 50-13-19,[3] in the Superior Court of Fulton County on January 19, 2018. Southern Crescent

---

[3] *See* OCGA § 50-13-19 (a) ("Any person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter. This Code section does not limit utilization of or the scope of judicial review available under other means of review, redress, relief, or trial de novo provided by law. A preliminary, procedural, or intermediate agency action or ruling is immediately reviewable if review of the final agency decision would not provide an adequate remedy.").

argued that the Department erred by overturning the two prior agency reviews of the issue. But following a hearing, the trial court denied Southern Crescent's petition, affirming the Department's decision. We subsequently granted Southern Crescent's application for a discretionary appeal, which follows.

Under Georgia's Administrative Procedure Act,[4] parties aggrieved by an agency's final decision are entitled to judicial review in superior court.[5] The review "shall be conducted by the court without a jury and shall be confined to the record";[6] and the court "shall not substitute its judgment for that of the agency as to the weight

_____

[4] *See* OCGA § 50-13-1 *et seq.*

[5] *See* OCGA § 50-13-19 (a) ("Any person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter."); OCGA § 50-13-19 (b) (providing that petitions for review may be filed in certain delineated superior courts); *see also* OCGA § 31-6-44.1 (a) ("Any party to the initial administrative appeal hearing conducted by the appointed appeal panel hearing officer, excluding the department, may seek judicial review of the final decision in accordance with the method set forth in Chapter 13 of Title 50, the 'Georgia Administrative Procedure Act,' except as otherwise modified by this Code section[.]"); OCGA § 31-6-44 (m) ("Unless the hearing officer's decision becomes the department's final decision by operation of law as provided in subsection (j) of this Code section, the decision of the commissioner shall become the department's final decision by operation of law. Such final decision shall be the final department decision for purposes of Chapter 13 of Title 50, the 'Georgia Administrative Procedure Act.'").

[6] OCGA § 50-13-19 (g).

of the evidence on questions of fact"[7] and "may affirm the decision of the agency or remand the case for further proceedings."[8] The reviewing court may reverse or modify the agency's decision if

> substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) [i]n violation of constitutional or statutory provisions; (2) [i]n excess of the statutory authority of the agency; (3) [m]ade upon unlawful procedure; (4) [a]ffected by other error of law; (5) [c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) [a]rbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.[9]

Upon further discretionary appeal to this Court, our duty is not to review whether the record supports the trial court's decision but to determine whether "the record supports the final decision of the administrative agency."[10] In this regard,

---

[7] OCGA § 50-13-19 (h).

[8] *Id.*

[9] OCGA § 50-13-19 (h).

[10] *Broad St. Supermarket, Inc. v. Ga. Dep't of Comm. Health*, 345 Ga. App. 1, 3 (1) (812 SE2d 325) (2018) (punctuation omitted) (emphasis supplied); *accord N. Atlanta Scan. Assoc., Inv. v. Ga. Dep't of Comm. Health*, 277 Ga. App. 583, 584 (627 SE2d 67) (2006); *see Swafford v. Dade Cnty. Bd. of Com'rs*, 266 Ga. 646, 648-49 (6) (469 SE2d 666) (1996) ("In considering this issue, we have reviewed the evidence presented to the board because on appeal our duty is not to review whether the record

agency findings of fact are reviewed to determine if they are supported by any evidence, while an agency's conclusions of law are reviewed *de novo*.[11]

With these guiding principles in mind, we will now address Southern Crescent's contentions that the trial court erred in denying the petition for review when the Department's final decision (1) does not follow its rules and is inconsistent with the plain language of various Georgia statutes, and (2) departs from longstanding departmental precedent, making the decision arbitrary and capricious, and violating Southern Crescent's constitutional rights.

---

supports the superior court's decision but whether the record supports the initial decision of the local governing body or administrative agency." (punctuation omitted)).

[11] *See Broad St. Supermarket*, 345 Ga. App. at 3 (1) (noting that courts review agency findings of fact for any evidence, while conclusions of law are reviewed *de novo*); *Ga. Dep't of Comm. Health v. Fulton-DeKalb Hosp. Auth.*, 294 Ga. App. 431, 431 (669 SE2d 233) (2008) (same); *see also Emory Univ. v. Levitas*, 260 Ga. 894, 896 (1) (401 SE2d 691) (1991) ("[W]e have previously ruled that in Georgia the substantial-evidence standard is effectively the same as the any-evidence standard."), *abrogated on other grounds by Pruitt Corp. v. Ga. Dep't of Comm. Health*, 284 Ga. 158 (664 SE2d 223) (2008).

1. In two separate enumerations of error, Southern Crescent argues that the superior court erred in denying the petition for review when the Department's final decision does not follow Department Rule 111-2-2-.26 and is inconsistent with the plain language of various Georgia statutes.[12]

When construing statutes, agency rules, and regulations, we employ the rules of statutory construction and look to the plain language of the relevant text to determine its meaning.[13] In doing so, we must construe the statute, rule, or regulation "according to its own terms, to give words their plain and ordinary meaning, and to avoid a construction that makes some language mere surplusage."[14] Still, even if

---

[12] Although Southern Crescent includes an additional argument that Flint River violated its CON by converting from a general acute care hospital to a specialty hospital, *see* OCGA § 31-6-40 (a) (6) (providing that a CON is required for "[a]ny conversion or upgrading of any general acute care hospital to a specialty hospital . . ."), we do not address this contention because it was not ruled upon below, *see Brookfield Country Club, Inc. v. St. James-Brookfield, LLC*, 287 Ga. 408, 413 (3) (696 SE2d 663) (2010) ("Issues which have not been ruled on by the trial court may not be raised on appeal." (punctuation omitted)); *Ga. Dep't of Nat'l Res. v. Coweta Cnty.*, 261 Ga. 484, 484 (405 SE2d 470) (1991) (same).

[13] *See Upper Chattahoochee Riverkeeper, Inc. v. Forsyth Cty.*, 318 Ga. App. 499, 502 (1) (734 SE2d 242) (2012); *accord Pfeiffer v. Dep't of Transp.*, 250 Ga. App. 643, 646-47 (2) (551 SE2d 58) (2001).

[14] *New Cingular Wireless PCS, LLC v. Ga. Dep't of Revenue*, 303 Ga. 468, 472 (2) (813 SE2d 388) (2018) (punctuation omitted); *accord Lyman v. Cellchem International, Inc.*, 300 Ga. 475, 477 (796 SE2d 255) (2017).

words are apparently plain in meaning, they "must not be read in isolation and instead, must be read in the context of the [statute, rule, or] regulation as a whole."[15] Additionally, judicial deference is—for the time being— "to be afforded the agency's interpretation of statutes it is charged with enforcing or administering and the agency's interpretation of rules and regulations it has enacted to fulfill the function

---

[15] *Upper Chattahoochee Riverkeeper*, 318 Ga. App. at 502 (1); *accord Pfeiffer*, 250 Ga. App. at 647 (2); *see also New Cingular Wireless PCS*, 303 Ga. at 472 (2) ("In this regard, in construing language in any one part of a statute [or regulation], a court should consider the entire scheme of the statute [or regulation] and attempt to gather the legislative intent from the [text of] statute [or regulation] as a whole." (punctuation omitted)).

given it by the legislative branch."[16] With these canons of construction in mind, we turn now to the relevant Certificate-of-Need authority.

(a) *The Relevant Certificate-of-Need Statutes, Rules, and Regulations.*

(i) *What is a Certificate of Need?*

---

[16] *Pruitt Corp. v. Ga. Dep't of Comm. Health*, 284 Ga. 158, 159 (2) (664 SE2d 223) (2008); *see Ga. Dep't of Rev. v. Owens Corning*, 283 Ga. 489, 490 (660 SE2d 719) (2008) ("[T]he interpretation of a statute by an administrative agency which has the duty of enforcing or administering it is to be given great weight and deference."). Some judges of this Court believe the time has come to reconsider such deference. As Judge Don Willett has aptly noted, "interpreting the laws under which Americans live is a quintessentially judicial function." *Forrest Gen. Hosp. v. Azar*, No. 18-60227, ___ F3d ___, ___ 2019 WL 2417409, at *5 (II) (A) (1) (5th Cir. June 10, 2019); *see also Marbury v. Madison*, 5 U.S. 137, 177 (2 LE2d 60) (1803) (holding that "it is emphatically the province and duty of the judicial department to say what the law is"); *Michigan v. E.PA.*, ___ U.S. ___ (135 SCt 2699, 2712-2714, 192 LEd2d 674) (2015) (Thomas, J., concurring) ("The judicial power, as originally understood, requires a court to exercise its independent judgment in interpreting and expounding upon the laws. Interpreting . . . statutes—including ambiguous ones administered by an agency—calls for that exercise of independent judgment. *Chevron* deference precludes judges from exercising that judgment, forcing them to abandon what they believe is the best reading of an ambiguous statute in favor of an agency's construction. It thus wrests from Courts the ultimate interpretive authority to 'say what the law is,' and hands it over to the Executive . . . . [W]e seem to be straying further from the Constitution without so much as pausing to ask why. We should stop to consider that document before blithely giving the force of law to any other agency 'interpretations' of federal statutes." (citations & punctuation omitted)); *City of Guyton v. Barrow*, Case No. S18G0944, 2019 WL 2167460, at *1 (Ga. May 20, 2019) ("At the core of the judicial power is the authority and the responsibility to interpret legal text.").

11

Georgia law provides that the Department is "authorized to administer the certificate of need program established under this chapter" and, likewise, must "provide, by rule, for procedures to administer its functions until otherwise provided by the [Board of Community Health]."[17] Thus, the General Assembly further provided that one of the Department's functions is to "adopt, promulgate, and implement rules and regulations sufficient to administer the provisions of this chapter including the certificate of need program"[18] and "define, by rule, the form, content, schedules, and procedures for submission of applications for certificates of need and periodic reports."[19] Additionally, the Department is bestowed by law with the power to

> establish, by rule, need methodologies for new institutional health services and health facilities. In developing such need methodologies, the department shall, at a minimum, consider the demographic characteristics of the population, the health status of the population, service use patterns, standards and trends, financial and geographic accessibility, and market economics.[20]

---

[17] OCGA § 31-6-21 (a); *see* OCGA § 31-6-2 (5) (defining "board" as the "Board of Community Health").

[18] OCGA § 31-6-21 (b) (4).

[19] OCGA § 31-6-21 (b) (5).

[20] OCGA § 31-6-21 (b) (8).

To that end, "Certificate of Need" is defined by both statute and rule to mean "an official determination by the Department, evidenced by certification issued pursuant to an application, that the action proposed in the application satisfies and complies with the criteria contained in the Statute and Rules promulgated pursuant thereto."[21] And the purpose of the CON program and its evaluation process, under both statute and Department Rule, is to ensure that (1) adequate health care services and facilities are developed "in an orderly and economical manner," (2) such services and facilities are available to all Georgia citizens, and (3) only health-care services found to be in the public interest will be provided.[22] In this regard, two of the five

---

[21] Ga. Comp. R. & Regs. 111-2-2-.01 (14); *see* OCGA § 31-6-2 (6) ("'Certificate of need' means an official determination by the department, evidenced by certification issued pursuant to an application, that the action proposed in the application satisfies and complies with the criteria contained in this chapter and rules promulgated pursuant hereto.").

[22] OCGA § 31-6-1 ("The policy of this state and the purposes of this chapter are to ensure access to quality health care services and to ensure that health care services and facilities are developed in an orderly and economical manner and are made available to all citizens and that only those health care services found to be in the public interest shall be provided in this state."); Ga. Comp. R. & Regs. 111-2-2-.02 (1) ("The purpose of the Certificate of Need evaluation process is to ensure that adequate health care services and facilities are developed in an orderly and economical manner and are made available to all Georgians and that only those health care services that are found to be in the public interest shall be provided in the State.").

goals of the evaluation process are to "[e]nsure compatibility of health care services with the needs of various areas and populations of Georgia"[23] and "[p]revent unnecessary duplication or services."[24]

(ii) *When is a Certificate of Need Required?*

Both statutory authority and the Department's rules provide separate delineations for when a CON must be obtained, and this lies at the heart of the parties' dispute.

Under OCGA § 31-6-40, after July 1, 2008, a certificate of need is required for (1) "any new institutional health service," which is defined to include, *inter alia*,

---

[23] Ga. Comp. R. & Regs. 111-2-2-.02 (1) (d); *see also* OCGA § 31-6-1 ("Health care services and facilities should be provided in a manner . . . that is compatible with the health care needs of the various areas and populations of the state.").

[24] Ga. Comp. R. & Regs. 111-2-2-.02 (1) (e); *see* OCGA § 31-6-1 ("Health care services and facilities should be provided in a manner that avoids unnecessary duplication of services[.]"); *Ga. Dep't of Comm. Health v. Satilla Health Srvs., Inc.*, 266 Ga. App. 880, 886 (1) (c) (598 SE2d 514) (2004) ("The legislature created the CON requirements to avoid costly and unnecessary duplication of health-care services."). The other goals are to "[r]eview proposed health care services; . . . [c]ontain health costs; . . . [and] [p]romote economic value[.]" Ga. Comp. R. & Regs. 111-2-2-.02 (1) (a)-(c); *see* OCGA § 31-6-1 ("The policy of this state and the purposes of this chapter are to ensure access to quality health care services and to ensure that health care services and facilities are developed in an orderly and economical manner and are made available to all citizens and that only those health care services found to be in the public interest shall be provided in this state.").

14

"construction, development, or other establishment of a new health care facility;"[25] (2) "[a]ny increase in the bed capacity of a health care facility except as provided in Code Section 31-6-47;"[26] and (3) "[c]linical health services which are offered in or through a health care facility, which were not offered on a regular basis in or through such health care facility within the 12 month period prior to the time such services would be offered."[27]

Moreover, under the Department's Rules, separate rules specify that a CON is required for 17 different types of programs, services, and facilities,[28] with these individual rules providing unique, detailed standards and definitions applicable to each.[29] But here, we are concerned with Rule 111-2-2-.26, which provides that a CON

[25] OCGA § 31-6-40 (a) (1).

[26] OCGA § 31-6-40 (a) (4); *see* OCGA § 31-6-47 (providing exemptions for specific types of facilities or activities).

[27] OCGA § 31-6-40 (a) (5).

[28] *See generally* Ga. Comp. R. & Regs. 111-2-2-.11 (1) (a)-(c) (listing the categories for which the Department has adopted service-specific requirements and rule considerations).

[29] *See* Ga. Comp. R. & Regs. 111-2-2-.20 (covering short-stay general hospitals); Ga. Comp. R. & Regs. 111-2-2-.21 (covering adult cardiac catheterization services); Ga. Comp. R. & Regs. 111-2-2-.22 (covering adult open heart surgical services); Ga. Comp. R. & Regs. 111-2-2-.23 (covering pediatric cardiac catheterization services or pediatric cardiac surgery services); Ga. Comp. R. & Regs.

is required "prior to the establishment of a new *or the expansion of an existing* acute care adult psychiatric and/or substance abuse inpatient program."[30] And Rule 111-2-2-.26 goes on to define an "acute care psychiatric and/or substance abuse inpatient program" as

> a psychiatric or substance abuse program . . . that provides acute and/or emergency stabilization and other treatment for acute episodes. An acute care program provides medically oriented evaluation, diagnosis, stabilization, and short-term treatment using individual and/or group therapies as well as other treatment activities. Two acute care programs are defined: adult psychiatric and/or substance abuse and pediatric psychiatric and/or substance abuse.[31]

---

111-2-2-.24 (covering perinatal services); Ga. Comp. R. & Regs. 111-2-2-.25 (covering freestanding birthing centers); Ga. Comp. R. & Regs. 111-2-2-.26 (covering psychiatric and substance abuse inpatient programs); Ga. Comp. R. & Regs. 111-2-2-.30 (covering skilled nursing and intermediate care facilities); Ga. Comp. R. & Regs. 111-2-2-.31 (covering personal care homes); Ga. Comp. R. & Regs. 111-2-2-.32 (covering home health agency services); Ga. Comp. R. & Regs. 111-2-2-.33 (covering continuing care retirement community sheltered nursing facilities); Ga. Comp. R. & Regs. 111-2-2-.34 (covering traumatic brain injury facilities); Ga. Comp. R. & Regs. 111-2-2-.35 (covering comprehensive inpatient physical rehabilitation services); Ga. Comp. R. & Regs. 111-2-2-.36 (covering long-term care hospitals); Ga. Comp. R. & Regs. 111-2-2-.40 (covering ambulatory surgery services); Ga. Comp. R. & Regs. 111-2-2-.41 (covering positron emission topography units); Ga. Comp. R. & Regs. 111-2-2-.42 (covering MegaVoltage Radiation Therapy services/units).

[30] Ga. Comp. R. & Regs. 111-2-2-.26 (1) (a) (emphasis supplied).

[31] Ga. Comp. R. & Regs. 111-2-2-.26 (2) (a).

And "psychiatric and/or substance abuse inpatient program" is defined as "an organized entity with a specific plan and intent to serve a special population via designated staff in designated beds in a licensed hospital," which "provides services on a 24-hour, seven days per week basis."[32] The definition goes on to explain that the characteristics of such a program include "a clear, distinct plan which includes admission policies and criteria, treatment protocol, etc.; and . . . appropriately trained personnel for the age and disability group to be served by the program; and . . . all of the beds in a program are designated for patients in that specific program."[33] Additionally, "expansion" is defined as "the addition of beds to an existing CON-authorized or grandfathered psychiatric and/or substance abuse inpatient program."[34] And "new" is defined as, *inter alia*, "a psychiatric and/or substance abuse inpatient program that has not offered a similar program in the prior twelve months."[35]

---

[32] Ga. Comp. R. & Regs. 111-2-2-.26 (2) (j).

[33] Ga. Comp. R. & Regs. 111-2-2-.26 (2) (j) (1)-(3).

[34] Ga. Comp. R. & Regs. 111-2-2-.26 (2) (c).

[35] Ga. Comp. R. & Regs. 111-2-2-.26 (2) (g).

(iii) *How is a Certificate of Need Obtained, and What Does the Department Consider?*

A CON is obtained by filing an application with the Department. But prior to applying for a CON, applicants are required by both statute and rule to submit a "letter of intent" no more than 30 days prior to submitting the application.[36] Then, when applying for the CON, the applicant must include, *inter alia*, "a detailed and complete description of the proposed project"[37] and the project's "justification, including specific documentation of the need (utilizing the Department's data and methodology) that the population to be served has for the project[.]"[38] Should the Department discover that false information was intentionally provided in the application, the Department may revoke a CON.[39]

---

[36] *See* Ga. Comp. R. & Regs. 111-2-2-.06 (1); *see also* OCGA § 31-6-40 (b) ("Any person proposing to develop or offer a new institutional health service or health care facility shall, before commencing such activity, submit a letter of intent and an application to the department and obtain a certificate of need in the manner provided in this chapter unless such activity is excluded from the scope of this chapter.").

[37] Ga. Comp. R. & Regs. 111-2-2-.06 (2) (e).

[38] Ga. Comp. R. & Regs. 111-2-2-.06 (2) (f).

[39] *See* OCGA § 31-6-45 (a) (2) ("The department may revoke a certificate of need, in whole or in part, after notice to the holder of the certificate and a fair hearing

18

During the application process, a petition may be amended within a certain period of time, with "amendment" defined as "a revision to the additional information or application as originally submitted . . . that constitutes a change in scope, physical location, cost, charge, service, or owner."[40] The rule on amendments provides that, among others, changes to an application that constitute an amendment are a "reduction or increase in the number of proposed beds or service units (e.g. operating rooms)"[41] and a "reduction or subtraction in the scope of the original application[.]"[42]

As far as what the Department considers when assessing a CON application for an expanded acute care adult psychiatric and/or substance abuse inpatient program, the rules provide that such applications are subject to review "under the General

---

. . . for . . . [t]he intentional provision of false information to the department by an applicant in that applicant's application[.]").

[40] Ga. Comp. R. & Regs. 111-2-2-.07 (1) (f) (2); *see also* OCGA § 31-6-43 (c) ("The department shall specify by rule the time within which an applicant may amend its application. The department may request an applicant to make amendments. The department decision shall be made on an application as amended, if at all, by the applicant.").

[41] Ga. Comp. R. & Regs. 111-2-2-.07 (1) (f) (2) (ii).

[42] Ga. Comp. R. & Regs. 111-2-2-.07 (1) (f) (2) (vi).

Review Considerations of Rule 111-2-2-.09 and the service-specific review considerations of this Rule."[43]

The general review considerations for CON applications are contained in both the aforementioned rule *and* in OCGA § 31-6-42.[44] And while this rule and statute

---

[43] Ga. Comp. R. & Regs. 111-2-2-.26 (1) (a); *see* Ga. Comp. R. & Regs. 111-2-2-.11 (2) ("The review considerations and standards that are promulgated in service-specific rules are considerations and standards that apply to specific services in addition to the general considerations in 111-2-2-.09. Any conflict between the meaning or application of a service-specific requirement and the general considerations shall be interpreted in favor of the service-specific consideration, unless a general consideration specifically indicates that it supersedes any and all service-specific considerations."). Rule 111-2-2.26 (1) (a) further provides that

> [f]or purposes of [the] rules, a service, facility, or program approved as an acute care adult psychiatric and/or substance abuse inpatient program may offer both acute care psychiatric and acute care substance abuse inpatient care, acute care substance abuse inpatient care alone, or acute care psychiatric inpatient care alone. A facility approved to offer acute care adult psychiatric and/or substance abuse inpatient services may not offer an acute care pediatric psychiatric and/or substance abuse inpatient program, nor any type of extended care psychiatric and/or substance abuse program without first obtaining a certificate of need.

[44] *See* OCGA § 31-6-42 (a) ("The department shall issue a certificate of need to each applicant whose application is consistent with the following considerations and such rules deemed applicable to a project . . . ."); Ga. Comp. R. & Regs. 111-2-2-.09 (1) ("In conducting review and making findings for Certificates of Need, the Department will consider [the following criteria.]").

20

largely contain identical language in delineating the general requirements, in many of its subsections, the rule expands upon and further explains or limits the criteria.[45] But among the general review considerations contained in both, the Department considers whether "the population residing in the area served, or to be served, by the new institutional health service has a need for such services."[46] The Department also considers whether

> existing alternatives for providing services in the service area the same as the new institutional health service proposed are neither currently available, implemented, similarly utilized, nor capable of providing a less costly alternative, or no [CON] to provide such alternative services has been issued by the Department and is currently valid.[47]

Additionally, the Department considers whether "[t]he proposed new institutional health service can obtain the necessary resources, including health care personnel and management personnel[,]"[48] and whether "[t]he proposed new institutional health

---

[45] *Compare* Ga. Comp. R. & Regs. 111-2-2-.09 (1) (a)-(q) *with* OCGA § 31-6-42 (a) (1)-(17).

[46] OCGA § 31-6-42 (a) (2); *accord* Ga. Comp. R. & Regs. 111-2-2-.09 (1) (b).

[47] Ga. Comp. R. & Regs. 111-2-2-.09 (1) (c); *accord* OCGA § 31-6-42 (a) (3).

[48] OCGA § 31-6-42 (a) (16); *accord* Ga. Comp. R. & Regs. 111-2-2-.09 (1) (p).

21

service is an underrepresented health service, as determined annually by the [D]epartment."[49]

Although there is no corresponding statute, separate from the general considerations, Department Rule 111-2-2-.26 provides for the aforementioned service-specific review considerations for issuance of a CON for psychiatric and/or substance abuse programs.[50] And to that end, depending upon the specific circumstances surrounding the program, an application for an expanded program must provide documentation to show, in relevant part, (1) the need for the program in the planning area,[51] and (2) that the program will not adversely impact similar existing and CON-approved programs in the planning region.[52]

---

[49] OCGA § 31-6-42 (a) (17); *accord* Ga. Comp. R. & Regs. 111-2-2-.09 (1) (q).

[50] *See* Ga. Comp. R. & Regs. 111-2-2-.26 (3) (providing for standards related to application for and approval of certificates of need for psychiatric and/or substance abuse programs).

[51] Ga. Comp. R. & Regs. 111-2-2-.26 (3) (a). This portion of the Rule further provides that, "in the case of an application for an *expanded* psychiatric and/or substance abuse inpatient program, the applicant shall justify the need for the expansion by, at a minimum, documenting that the expansion program has achieved an occupancy rate of 80 percent for an adult program . . . ." *Id.* (emphasis supplied).

[52] Ga. Comp. R. & Regs. 111-2-2-.26 (3) (d). This does not apply to state-owned and operated psychiatric and substance-abuse regional hospitals. *Id.* This requirement further delineates the situations in which adult and pediatric programs

(iv) *What Does a Certificate of Need Include?*

When the Department reaches a decision on a CON application, it is required to provide the applicant with notice of that decision.[53] The Department's written findings of fact and its decision must specify which of the general considerations and service-specific considerations, detailed *supra*, are applicable to the CON application.[54] The Department must also provide "its reasoning as to and evidentiary support for its evaluation of each such applicable consideration and rule."[55]

---

*will* have an adverse impact. *See* Ga. Comp. R. & Regs. 111-2-2-.26 (3) (d) (1) (i)-(ii) (providing standard for adverse impact of adult programs); Ga. Comp. R. & Regs. 111-2-2-.26 (3) (d) (2) (i)-(ii) (providing standard for adverse impact of pediatric programs).

[53] *See* OCGA § 31-6-43 (i) ("Unless extended by the department for an additional period of up to 30 days pursuant to subsection (d) of this Code section, the department shall, no later than 120 days after an application is determined to be complete for review, or, in the event of joined applications, 120 days after the last application is declared complete for review, provide written notification to an applicant of the department's decision to issue or to deny issuance of a certificate of need for the proposed project. . . .").

[54] OCGA § 31-6-42 (e); *see also* OCGA § 31-6-43 (i) ("[The Department's] notice shall contain the department's written findings of fact and decision as to each applicable consideration or rule and a detailed statement of the reasons and evidentiary support for issuing or denying a certificate of need for the action proposed by each applicant.").

[55] OCGA § 31-6-42 (e); *see also* OCGA § 31-6-43 (i) ("[The Department's] notice shall contain the department's written findings of fact and decision as to each

When a CON is issued, the Department's rules provide that it must specify, but is not limited to, *inter alia*, "the scope of the project"[56] and "the services or units of services, which have been approved[.]"[57] Importantly, these rules explain that a CON "shall be valid only for the defined scope, physical location, cost, service area, and person named in the application as the applicant."[58]According to statute, a CON "shall be valid *only for the defined scope*, location, cost, service area, and person named in an application, . . . and as such *scope*, location, service area, cost, and person *are approved by the department*, unless such certificate of need owned by an

applicable consideration or rule and a detailed statement of the reasons and evidentiary support for issuing or denying a certificate of need for the action proposed by each applicant.").

[56] Ga. Comp. R. & Regs. 111-2-2-.02 (2) (a).

[57] Ga. Comp. R. & Regs. 111-2-2-.02 (2) (h). The other criteria which must be included in the CON are "the defined location of the project; . . . the person to whom the certificate was issued; . . . the maximum capital expenditure, if any, which may be obligated under the certificate; . . . the service area of the project; . . . the valid dates; . . . the schedule of time periods to be followed in making the service or equipment available or in completing the project; . . . [and] when the progress reporting requirements under 111-2-2-.04 (2) and 111-2-2-.02 (5) are due." Ga. Comp. R. & Regs. 111-2-2-.02 (2) (b)-(g), (i).

[58] Ga. Comp. R. & Regs. 111-2-2-.02 (3).

existing health care facility is transferred to a person who acquires such existing facility."[59]

(v) *How are Certificates of Need Enforced?*

In order to enforce CONs, the Department's rules provide it with the right to "inspect and audit any facility, site, location, book, document, paper, files, or other record of the holder of the certificate of need . . . to monitor and evaluate the person's compliance with the terms of issuance of the certificate of need . . . ."[60] Furthermore, these rules provide the Department with authority "to make public or private investigations or examinations . . . to determine whether all provisions of" the *statutes* related to issuance of certificates of need have been violated.[61] And the Department

---

[59] OCGA § 31-6-41 (a).

[60] Ga. Comp. R. & Regs. 111-2-2-.05 (3).

[61] *See id.* ("The Department shall have the authority to make public or private investigations or examinations inside or outside of the state of Georgia to determine whether all provisions of [OCGA] § 31-6-2 et. seq. or any other law, rule, regulation, or formal order relating to the provisions of [OCGA] § 31-6-40 in particular, has been violated. Such investigations may be initiated at any time in the discretion of the Department and may continue during the pendency of any action initiated by the Department pursuant to section (1) (a) of this rule. For the purpose of conducting any investigation or inspection pursuant to this subsection, the Department shall have the authority, upon providing reasonable notice, to require the production of any books, records, or other information related to any certificate of need issue.").

may revoke a CON if it is determined, after a hearing, that the holder of a CON has, among other reasons, "[f]ailed to comply with any and all requirements or conditions of the Certificate[.]"[62]

(b) *The Department's Final Decision.*

In its final review, the Department disagreed with the hearing officer's interpretation that "the reconfiguration of . . . beds within existing licenced capacity . . . is governed by OCGA § 31-6-41 (a)," concluding instead that OCGA § 31-6-2 (14) and OCGA § 31-6-40 controlled. Specifically, the Department held that Flint River "reconfigured" its existing beds within the meaning of OCGA § 31-6-2 (14) and OCGA § 31-6-40. But Southern Crescent argues that the Department's final decision is inconsistent with the plain language of OCGA § 31-6-41 and OCGA § 31-6-40, contending that it violates the rule requiring a CON "prior to the establishment of a new *or the expansion of an existing* acute care adult psychiatric and/or substance abuse inpatient program."[63]

---

[62] Ga. Comp. R. & Regs. 111-2-2-.05 (1) (a) (6); *see also* OCGA § 31-6-45 ("The [D]epartment may revoke a certificate of need, in whole or in part, after notice to the holder of the certificate and a fair hearing . . . for . . . [f]ailure to comply with the provisions of OCGA § 31-6-41[.]").

[63] Ga. Comp. R. & Regs. 111-2-2-.26 (1) (a) (emphasis supplied).

26

(c) *Our Conclusion*.

Having considered the above-detailed statutes and regulations, we agree with Southern Crescent that the Department's final decision is erroneous in its interpretation of the relevant statutes and rules. We disagree, then, with the Department's conclusion that Flint River "flexed"—*i.e.*, reallocated or redistributed—beds from one approved service to use in another approved service without increasing the total number of beds within the facility as a whole and, as a result, was not required to obtain a CON prior to initiating this change.

Southern Crescent correctly notes that Department Rule 111-2-2-.26 (a) explicitly requires that a CON be obtained "prior to . . . the expansion of an existing acute care adult psychiatric and/or substance abuse inpatient program." And once again, "expansion" is defined within that Rule to mean "the addition of beds to an existing CON-authorized or grandfathered psychiatric and/or substance abuse inpatient program."[64]

---

[64] *Id.* 2 (c). The definition further provides that

A CON-authorized or grandfathered freestanding psychiatric and/or substance abuse hospital may increase its bed capacity by the lesser of ten percent of existing capacity or 10 beds if it has maintained an average occupancy of 85 percent for the previous twelve calendar

27

While it is true that OCGA § 31-6-40 (a) does not specifically include the expansion of existing programs in its list of "new institutional health services" that are required to obtain a CON,[65] that list is not exclusive. Indeed, the plain language of the statute provides that "[n]ew institutional health services *include*" the categories that follow within the Code Section,[66] whereas elsewhere the General Assembly gave the Department the power to

> months provided that there has been no such increase in the prior two years and provided that the capital expenditures associated with the increase do not exceed the Capital Expenditure Threshold. If such an increase exceeds the Capital Expenditure Threshold, the increase will be considered an expansion for which a Certificate of Need shall be required under these Rules.

*Id.* Flint River does not argue that its addition of beds was permitted under this portion of the definition, nor would the facts of this case support the addition under this portion of the definition because Flint River added more than ten percent of its then-existing capacity and more than 10 beds.

[65] *See* OCGA § 31-6-40 (a) (1)-(7).

[66] *See id*. § 31-6-40 (a) (emphasis supplied); *see also Wetzel v. State*, 298 Ga. 20, 32 (4) (a) (779 SE2d 263) (2015) ("Determining the sense in which the legislature used 'including' in a particular statute depends on the exact language, context, and subject matter of the statute."). *But see* Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 132 (1st ed. 2012) ("The word *include* does not ordinarily introduce an exhaustive list, while *comprise . . .* ordinarily does.").

28

establish, by rule, need methodologies for new institutional health services and health facilities. In developing such need methodologies, the department shall, at a minimum, consider the demographic characteristics of the population, the health status of the population, service use patterns, standards and trends, financial and geographic accessibility, and market economics.[67]

And this specific subsection further provides that the Department is required to "establish service-specific need methodologies and criteria for . . . psychiatric and substance abuse inpatient programs[.]"[68] Additionally, the General Assembly also provided that another function of the Department is to "adopt, promulgate, and implement rules and regulations sufficient to administer the provisions of this chapter including the certificate of need program[.]"[69]

Thus, as part of its functions delineated by OCGA § 31-6-21, the Department saw fit to require by its Rules that the expansion of an existing psychiatric and/or substance abuse facility requires a CON. This rule is consistent with the statutory specification that CONs are "valid *only for* the defined *scope . . .* and as such *scope*

---

[67] OCGA § 31-6-21 (b) (8).

[68] *Id.*

[69] OCGA § 31-6-21 (b) (4).

29

. . . [is] approved by the department . . . ."[70] In other words, when the Department approves a CON for 12 psychiatric/substance abuse beds, as was done here, the CON is valid *only for* that defined scope. Indeed, two of the purposes of the CON application process, as *codified* by the General Assembly, are to ensure that health care services and facilities are provided in a manner that "is compatible with the health care needs of the various areas and populations of the state"[71] and "avoids unnecessary duplication of services."[72] The implementation of these goals is reflected throughout the text of the relevant statutes and rules, and their overarching concerns are that the population have a need for a proposed service, the proposed service not adversely impact similar providers, and the facility has the ability to successfully provide the proposed service. We do not view, then, the relevant rule as an unauthorized "enlargement" of the scope of the CON statute, which the trial court

---

[70] OCGA § 31-6-41 (a) (emphasis supplied).

[71] OCGA § 31-6-1; *see also* Ga. Comp. R. & Regs. 111-2-2-.02 (1) (d) (listing "[e]nsure compatibility of health care services with the needs of various areas and populations of Georgia" as a goal of the Certificate of Need evaluation process).

[72] OCGA § 31-6-1; *see also* Ga. Comp. R. & Regs. 111-2-2-.02 (1) (e) (listing "[p]revent unnecessary duplication or services" as a goal of the Certificate of need evaluation process).

feared. Rather, the rule is entirely consistent with both the statutory scheme as a whole and the authority granted to the Department by statute.

Finally, we reject the assertion that the statutory history of OCGA § 31-6-2 demands a conclusion that no CON was required under the facts of this case.[73] Flint River has continuously argued that the statutory history of OCGA § 31-6-2 requires an interpretation that "bed reconfigurations" do not require a CON because the statute was amended in 1983 to remove from one of the definitions of "new institutional health service" the following italicized language: a "change in bed capacity of a health care facility which increases the total number of beds or *which redistributes beds among various categories . . . .*"[74] But what Flint River fails to acknowledge is that when the complained-of language existed in the Code—*and* when it was

---

[73] As we have previously explained, statutory history is different from legislative history, *see Duncan v. Rawls*, 345 Ga. App. 345, 350 (1) (b) n.10 (812 SE2d 647) (2018) ("Statutory history . . . differs from legislative history[.]"), with "statutory history" the "enacted lineage of a statute, including prior laws, amendments, codifications, and repeals," *Chalk v. Poletto*, 346 Ga. App. 491, 497 n.22 (816 SE2d 432) (2018) (McMillian, J., concurring fully & specially) (quoting Black's Law Dictionary, p. 1638 (10th ed. 2014)).

[74] *Compare* 1979 Ga. Laws 1109, 1114 (including the italicized language in amendment to former Ga. Code Ann. § 88-3302 (s) (3), which amendment provided definitions of certain terms), *with* 1983 Ga. Laws 1566, 1571 (deleting the italicized language in overhaul of Code, including amendment to former OCGA § 31-6-2 (14)).

31

deleted—"new institutional health service" was included with the general definitions that are applicable to the entire chapter.[75] And in that prior definition of "new institutional health service," the General Assembly made the list that followed *exclusive* by introducing the qualifying services as follows: "The term 'new institutional health service' means . . . ."[76] This was also the case *after* the 1983 amendment—the list was preceded by "means."[77] When the General Assembly again overhauled the Code in 2008, however, it moved the definition of "new institutional health service" to OCGA § 31-6-40, the section specifically devoted to required certificates of need, and at that time changed the definition from the exclusive "means" to the non-exclusive "include."[78]

---

[75] *See* former Ga. Code Ann. § 88-3302 (1979); former OCGA § 31-6-2 (1983).

[76] 1979 Ga. Laws at 1114 (providing for definition within former Ga. Code Ann. § 88-3302 (s)).

[77] *See* 1983 Ga. Laws at 1570 (amending former OCGA § 31-6-2 (14)).

[78] *See* 2008 Ga. Laws 12, 24 (removing definition from OCGA § 33-6-2 and codifying the current relevant language in OCGA § 31-6-40).

To be sure, "include" may be interpreted as a word of limitation *or* enlargement, and thus we must consider the context in which it is used.[79] In this respect, we find it relevant that, elsewhere within Article 3 of Chapter 6 of Title 31, the General Assembly added the words "but not limited to" to other lists.[80] Suffice it

---

[79] *See Berryhill v. Ga. Cmty. Support & Sol., Inc.*, 281 Ga. 439, 441 (638 SE2d 278) (2006) ("The word 'includes' in and of itself is not determinative of how it is intended to be used. Whether the term may be interpreted as one of limitation depends on the context, the subject matter, and legislative intent [as reflected by the relevant text]." (citations & punctuation omitted)).

[80] *See* OCGA § 31-6-40 (a) (7) (c) ("Clinical health services which are offered in or through a diagnostic, treatment, or rehabilitation center which were not offered on a regular basis in or through that center within the 12 month period prior to the time such services would be offered, but only if the clinical health services are any of the following[ ] . . . [s]urgery in an operating room environment, *including but not limited to* ambulatory surgery[.]" (emphasis supplied)); OCGA § 31-6-42 (a) (15) ("The department shall issue a certificate of need to each applicant whose application is consistent with the following considerations and such rules deemed applicable to a project, except as specified in subsection (f) of Code Section 31-6-43[ ] . . . [t]he proposed new institutional health service meets the department's minimum quality standards, *including, but not limited to*, standards relating to accreditation, minimum volumes, quality improvements, assurance practices, and utilization review procedures[.]" (emphasis supplied)); OCGA § 31-6-45 (a) (7) ("The department may not, however, revoke a certificate of need if the applicant changes the defined location of the project within the same county less than three miles from the location specified in the certificate of need for financial reasons or other reasons beyond its control, *including, but not limited to*, failure to obtain any required approval from zoning or other governmental agencies or entities, provided such change in location is otherwise consistent with the considerations and rules applied in the evaluation of the project." (emphasis supplied)); OCGA § 31-6-47 (a) (10.1) ("Notwithstanding the other provisions of this chapter, this chapter shall not apply to[, ] [e]xcept as provided

to say, the General Assembly could have qualified OCGA § 31-6-40 in the same way.[81] But we are also mindful that "[c]ourts should give a sensible and intelligent effect to every part of a statute and not render any language superfluous."[82]

---

in paragraph (10) of this subsection, expenditures for the minor or major repair of a health care facility or a facility that is exempt from the requirements of this chapter, parts thereof or services provided or equipment used therein; or the replacement of equipment, *including but not limited to* CT scanners previously approved for a certificate of need[.]" (emphasis supplied)); OCGA § 31-6-50 ("The review and appeal considerations and procedures set forth in Code Sections 31-6-42 through 31-6-44, respectively, shall apply to and govern the review of capital expenditures under the Section 1122 program of the federal Social Security Act of 1935,1 as amended, *including, but not limited to*, any application for approval under Section 1122 which is under consideration by the Health Planning Agency or on appeal before the Certificate of Need Appeal Panel, successor to the former Health Planning Review Board as of June 30, 2008." (emphasis supplied));

[81] *See Berryhill*, 281 Ga. at 441-42 ("[I]f the legislature had intended to use the word 'includes' as a broad term of illustration or enlargement, it presumably would have appended the phrase 'but is not limited to,' just as it supplied the phrase 'but not limited to' after the word 'including' in subsection (f) of the very same anti-SLAPP statute being construed in this case."); *Covington Square Assocs., LLC v. Ingles Markets, Inc.*, 283 Ga. App. 307, 310 (641 SE2d 266) (2007) ("The use of the phrase 'but not limited to' in Section 6.3, and its absence in Section 6.4, implies a different operation of the word 'include' as used in Section 6.4, in that it may be read in that context to be a limiting term, similar to 'shall consist of.'").

[82] *Berryhill*, 281 Ga. at 441.

34

Additionally, in other cases, our appellate courts have interpreted "include/including" to be *exclusive* when followed by a list of multiple specified phrases.[83]

But in this case, we are faced with a statutory scheme in which the General Assembly has *also* provided that one of the Department's functions is to "adopt, promulgate, and implement rules and regulations sufficient to administer the provisions of this chapter including the certificate of need program"[84] and to "define, by rule, the form, content, schedules, and procedures for submission of applications for certificates of need and periodic reports."[85] Additionally, the General Assembly specified by statute that CONs are "valid *only for the defined scope*, location, cost, service area, and person named in an application, . . . and as such *scope*, location,

---

[83] *See, e.g.*, *Wetzel v. State*, 298 Ga. at 32-33 (4) (a) ("Unlike in *Berryhill*, where 'includes' was followed by two very detailed specific phrases, 'including' in OCGA § 16-12-100.1 (a) (3) (B) is followed by only one specified method of making stored computer information available[.] If that single and straightforward method were meant to be the only prohibited way of 'allowing access to information stored on a computer,' then the general phrase preceding 'including' would be surplusage; the statute could have defined 'electronically furnishes' simply as 'to make available by operating a computer bulletin board system.' This is the converse of the situation in *Berryhill* and similar cases, where reading the list of multiple specified phrases following 'including' as merely illustrative of the preceding phrase would tend to render the specific phrases essentially superfluous." (citations omitted)).

[84] OCGA § 31-6-21 (b) (4).

[85] OCGA § 31-6-21 (b) (5).

service area, cost, and person *are approved by the department*, unless such certificate of need owned by an existing health care facility is transferred to a person who acquires such existing facility."[86] Thus, in the context of the statutory scheme as a whole, the most sensible interpretation of OCGA § 31-6-40 is that "includes" introduces a non-exclusive list, with the Department free to promulgate by rule additional categories of "new institutional health services," *but only* so as to administer and implement the certificate-of-need program and the strictures placed upon that program by the General Assembly.

In reaching this conclusion, we note that this case presents a situation quite different from those in which the Department has sought to create new *exclusions* from CON requirements.[87] Indeed, here, the General Assembly itself explicitly

---

[86] OCGA § 31-6-41 (a) (emphasis supplied).

[87] *See N. Fulton Med. Ctr. v. Stephenson*, 269 Ga. 540, 544 (1) (501 SE2d 798) (1998) ("[The] limited grant of authority does not authorize SHPA to establish a separate class of health care facilities and then exempt that class from the Code's requirements. Put another way, SHPA cannot, consistent with its limited authority to implement the Act, determine which facilities must comply with the Act's CON requirements, or unilaterally create exclusions from those requirements."); *HCA Health Servs. of Ga., Inc. v. Roach*, 265 Ga. 501, 502-03 (2) (458 SE2d 118) (1995) ("SHPA's construction of its authority under OCGA § 31-6-47 (c) [(now OCGA § 31-6-47 (b))] would permit it to do far more than merely administer and effectuate an existing enactment of the General Assembly. SHPA would have complete and unbridled authority to determine what health care facilities are subject to the Act,

provided that a CON is only valid for its defined scope. Thus, the rule at issue

provides the Department with the ability to "carry into effect *a law already passed*,"[88]

*i.e.*, the law that limits the validity of a CON to its original defined scope.

---

since it would have the power to exempt from the mandate of the Act any facility which the General Assembly had left unexempted, but the exemption of which SHPA otherwise 'deems compatible with the purposes of' the Act. This construction of OCGA § 31-6-47 (c) [(now OCGA § 31-6-47 (b))] would render that statutory provision an unconstitutional delegation to SHPA of the legislative power 'to define the thing to which the statute is to be applied[.]'"); *id.* at 503 (2) (holding that rule promulgated pursuant to former OCGA § 31-6-47 (c), now OCGA § 31-6-47 (b), "[evinced] an unconstitutional attempt to add to the legislative list of exemptions established by OCGA § 31-6-47 (a), by purporting to exempt certain relocations from compliance with the statutory CON requirements and thereby denying opposing parties the opportunity to obtain review by the Review Board and the courts"); *see also Albany Surgical, P.C. v. Dep't of Comm. Health*, 257 Ga. App. 636, 638 (1) (a) (572 SE2d 638) (2002) ("DHP has been limited by the General Assembly in exempting any provider from CON review except where the legislature has clearly and expressly provided exceptions, and the courts have consistently held that DHP lacks authority to expand or create new exceptions.").

[88] *Roach*, 265 Ga. at 502 (2) (emphasis supplied) (punctuation omitted); *see also Stephenson*, 269 Ga. at 543 (1) ("It is well established that administrative agencies such as SHPA are not authorized to enlarge the scope of, or supply omissions in, a properly-enacted statute. Nor may administrative agencies change a statute by interpretation, or establish different standards within a statute that are not established by a legislative body. Rather, as an administrative body, SHPA is authorized only to adopt and implement rules 'sufficient to administer' the Act's provisions, including the CON program." (footnote omitted)).

Additionally, effective July 1, 2019,[89] the General Assembly has once again substantially amended the CON statutory scheme, though none of the forthcoming amendments change the provisions discussed *supra* in any meaningful substantive way that would alter our conclusions in this opinion.[90] Indeed, one of the General Assembly's amendments is *consistent* with our ultimate conclusion in that it exempts "[t]he renovation, remodeling, refurbishment, or upgrading of a health care facility"[91] from the CON requirements, but goes on to specify that it does *not* apply if the renovation, refurbishment, or upgrade results in, *inter alia*, "[a]ny redistribution of existing beds among existing clinical health services[.]"[92]

Finally, when the Department promulgated Rule 111-2-2-.26 (a), it was required to send the proposed rule to legislative counsel who, in turn, sends proposed

---

[89] *See* OCGA § 1-3-4 (a) (1) ("Unless a different effective date is specified in an Act[ ] . . . [a]ny Act which is approved by the Governor or which becomes law without his approval on or after the first day of January and prior to the first day of July of a calendar year shall become effective on the first day of July[.]").

[90] *See generally* 2019 Ga. Laws Act 41 (H.B. 186).

[91] *See* 2019 Ga. Laws Act 41 (H.B. 186) § 1-8 (amending OCGA § 31-6-43 by, *inter alia*, adding (a) (27) (A)-(D)).

[92] *See id.*

38

rules to legislative committees and members for oversight.[93] And if there is no objection to the proposed rule from any legislator within 30 days of the distribution, then the Department can "adopt the proposed [rule]."[94] We have previously held that the General Assembly's acquiescence to a rule is evidence that the rule came within its intent as expressed by the Code and, thus, we presume rules to correctly express the General Assembly's stated intent (as reflected in the relevant text).[95]

[93] *See* OCGA § 31-6-21.1 (b) ("The department shall transmit three copies of the notice provided for in paragraph (1) of subsection (a) of Code Section 50-13-4 to the legislative counsel. The copies shall be transmitted at least 30 days prior to that department's intended action. Within five days after receipt of the copies, if possible, the legislative counsel shall furnish the presiding officer of each house with a copy of the notice and mail a copy of the notice to each member of the Health and Human Services Committee of the Senate and each member of the Health and Human Services Committee of the House of Representatives."); *Albany Surgical*, 257 Ga. App. at 639 (1) (a) ("Further, when promulgating its regulations, DHP must send all proposed regulations to legislative counsel, who, in turn, sends the proposed regulations to the legislative committees and members with oversight.").

[94] *Albany Surgical*, 257 Ga. App. at 639 (1) (a); *see* OCGA § 31-6-21.1 (b) ("Each such rule and any part thereof shall be subject to the making of an objection by either such committee within 30 days of transmission of the rule to the members of such committee. Any rule or part thereof to which no objection is made by both such committees may become adopted by the department at the end of such 30 day period.").

[95] *See Albany Surgical*, 257 Ga. App. at 639 (1) (a) ("Such acquiescence by the General Assembly is evidence that such regulation came within the intent of the legislature in enacting [the Code]. Thus, [the relevant rules] must be presumed to correctly express the legislative intent [as reflected by the relevant text]."); *see also*

39

The relevant Department rule, then, is consistent with the remainder of the statutory scheme, which permits the Department to develop rules, and which is overwhelmingly concerned with the appropriate distribution of services. Indeed, consistent with the explicitly *codified purposes* of the Code,[96] permitting a facility to exceed the defined scope of its CON without requiring a new CON could result in the unnecessary duplication of services, which is a consequence the General Assembly, by its enactments, could not have sanctioned.[97] Thus, here, the plain language of the

---

*United States v. Rutherford*, 442 US 544, 554 (II) (A) n.10 (99 SCt 2470, 61 LE2d 68) (1979) (holding that when the agency interpretation has been brought to the attention of the legislature, and the legislature does not act to correct it, then courts should presume that the legislative intent—as reflected by the relevant text—has been correctly discerned by the agency).

[96] *See* OCGA § 31-6-1 ("The policy of this state and the purposes of this chapter are to ensure access to quality health care services and *to ensure that health care services and facilities are developed in an orderly and economical manner and are made available to all citizens and that only those health care services found to be in the public interest shall be provided in this state*. To achieve such public policy and purposes, *it is essential that appropriate health planning activities be undertaken and implemented* and that a system of mandatory review of new institutional health services be provided. *Health care services and facilities should be provided in a manner that avoids unnecessary duplication of services*, that is cost effective, that provides quality health care services, *and that is compatible with the health care needs of the various areas and populations of the state*." (emphasis supplied)).

[97] *See Phoebe Putney Mem. Hosp., Inc. v. Roach*, 267 Ga. 619, 621 (1) (480 SE2d 595) (1997) ("If we were to permit CAS to relocate its mobile unit without obtaining a CON, the orderly implementation of SHPA's health plan would be

statute as it exists, the context of the statutory scheme, *and* the statutory history support our conclusion.[98]

For all these reasons, the trial court erred in denying Southern Crescent's petition for review when the Department's final decision was inconsistent with the plain language of the relevant statutes and rules, and we reverse its decision.

---

disrupted and the work of fixed cardiac catheterization services would be duplicated unnecessarily. The result would be a costly, inefficient health plan. The legislature could not have intended such consequences.").

[98] To the extent the parties rely upon *legislative* history in the form of various comments that have been made about the relevant statutes and rules, we reject their reliance on same. As Justice Antonin Scalia once aptly noted, "legislative history [is] the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends." *Conroy v. Aniskoff*, 507 U.S. 511, 519 (113 SCt 1562, 123 LE2d 229) (1993) (Scalia, J., concurring); *accord Day v. Floyd Cnty. Bd. of Educ.*, 333 Ga. App. 144, 151 (775 SE2d 622) (2015) (Dillard, J., concurring fully and specially). Indeed, as Georgians and Americans, we are "governed by laws, not by the intentions of legislators." *Conroy*, 507 U.S. at 519; *accord Day*, 333 Ga. App. at 151. And as judges, we should only be concerned with what laws actually say, not with "what the people who drafted the laws intended." *See Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) ("To that end, we must afford the statutory text its plain and ordinary meaning." (punctuation omitted)); *State v. Able*, 321 Ga. App. 632, 636 (742 SE2d 149) (2013) ("A judge is charged with interpreting the law in accordance with the original and/or plain meaning of the text at issue (and all that the text fairly implies) . . . ."); Scalia & Garner, *supra* note 66, at 16 ("Textualism, in its purest form, begins and ends with what the text says and fairly implies."). Accordingly, we do not consider the parties' arguments as they relate to legislative history.

2. Because we reverse the trial court in Division 1, *supra*, we need not address Southern Crescent's argument that the Department's decision departs from longstanding departmental precedent, making the decision arbitrary and capricious, and violating its constitutional rights.

*Judgment reversed. Gobeil and Hodges, JJ., concur.*